Barbara K. LIPTON and Michael Caesar, Applicants for Intervention Below, Appellants,

v.

NEWS INTERNATIONAL, Plc, an English Company, Plaintiff Below, Appellee,

v.

WARNER COMMUNICATIONS, INC., a Delaware corporation, Steven J. Ross, Emanuel Gerard, David H. Horowitz, Deane F. Johnson, Bert W. Wasserman, Caesar P. Kimmel, Martin D. Payson, Ted Ashley, Allan B. Ecker, Chris-Craft Industries, Inc., a Delaware corporation, Herbert J. Siegel, and BHC, Inc., a Delaware corporation, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: Oct. 29, 1985.
Re-Submitted: May 13, 1986.
Decided: Sept. 16, 1986.

Joseph A. Rosenthal and Norman M. Monhait of Morris and Rosenthal, P.A., Wilmington, Stanley Nemser (argued), I. Stephen Rabin and Patricia I. Avery of Wolf Popper Ross Wolf & Jones, Bruce E. Gerstein and Scott W. Fisher of Garwin, Bronzaft & Gerstein, New York City, of counsel, and Stuart H. Savett and Barbara A. Podell of Kohn, Savett, Marion & Graf, P.C., Philadelphia, of counsel, for applicants for intervention below, appellants.

Martin P. Tully of Morris, Nichols, Arsht & Tunnell, Wilmington, Neal M. Goldman (argued) of Squadron, Ellenoff, Plesent & Lehrer, New York City, of counsel, for plaintiff below-appellee.

Rodman Ward, Jr. and Anthony W. Clark (argued) of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Warner Communications, Inc. and the Warner Director defendants, defendants below-appellees.

Charles S. Crompton, Jr. and James F. Burnett of Potter, Anderson & Corroon, Wilmington,, for Chris-Craft Industries, Inc., BHC, Inc., and Herbert J. Siegel, defendants below-appellees.

Before McNEILLY, HORSEY and MOORE, JJ.

McNEILLY, Justice joined by HORSEY, Justice:

The case before us represents the efforts of two shareholders of Warner Communications, Inc. ("Warner") to vacate a stipulation of dismissal in an action against Warner by News International, plc ("News"), an English company controlled by K. Rupert Murdoch and formerly Warner's largest shareholder. The two shareholders ("Proposed Intervenors") contend that the action by News was derivative in nature, and that therefore the stipulation of dismissal was improper because the parties to it failed to comply with the notice and court approval provisions of Chancery Court Rule 23.1.[1] Thus, we must now determine whether News brought suit against Warner in its derivative or, as News contends, in its individual capacity.

## I.

In October 1983, News began purchasing shares of Warner common stock on the open market. On December 1, 1983, News filed a Schedule 13D with the Securities and Exchange Commission disclosing that it had acquired a 6.7% interest in Warner, thereby making News Warner's largest stockholder. By December 7, News had increased its holdings to approximately 7%.

By the end of December, and apparently in response to News' increased holdings in it, Warner had finalized an exchange agreement with Chris-Craft Industries, Inc. ("Chris-Craft") and BHC, Inc. ("BHC"), a wholly-owned subsidiary of Chris-Craft, pursuant to which Warner would exchange a 19% interest in its stock for a stock interest in BHC. Because Warner has in place an 80% supermajority voting requirement for certain shareholder actions, including the removal of directors, this 19% interest, if combined with those shares owned or controlled by Warner's management, would, in effect, give Chris-Craft a veto power over a change in Warner management or over other shareholder actions subject to the supermajority voting requirement.

In response to the Warner/Chris-Craft exchange agreement, News instituted the underlying action against Warner and certain members of its Board of Directors,

---

**1.** Chancery Court Rule 23.1 provides:

In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the ef-

fort. *The action shall not be dismissed or compromised without the approval of the Court, and notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the Court directs;* except that if the dismissal is to be without prejudice or with prejudice to the plaintiff only, then such dismissal shall be ordered without notice thereof if there is a showing that no compensation in any form has passed directly or indirectly from any of the defendants to the plaintiff or plaintiff's attorney and that no promise to give any such compensation has been made. (emphasis added).

Chris-Craft and its president, and BHC. News alleged that the agreement deprived News of its voting rights, wasted corporate assets, and was designed to entrench management. Initially, News sought to enjoin the consummation of the exchange agreement. The Court of Chancery refused to grant injunctive relief, noting that because Chris-Craft apparently had no obligation to vote its Warner shares with Warner management, the exchange agreement would not "deprive the plaintiff of any voting right or position which it now has." *News International plc v. Warner Communications, Inc., et al.,* Del.Ch., C.A. No. 7420, slip op. at 3 (Brown, C.) (January 12, 1984) (letter opinion).

Approximately two months later, the parties resolved their differences and, on March 16, 1984, entered into an agreement pursuant to which Warner purchased all Warner stock owned by News. On March 19, 1984, in accordance with their agreement, the parties filed a stipulation of dismissal in the action by News pursuant to Chancery Court Rule 41(a)(1).[2] The parties made no attempt to comply with the notice and court approval provisions of Chancery Court Rule 23.1.

Three days after the stipulation of dismissal was filed, the Proposed Intervenors moved both to vacate the dismissal for failing to comply with Rule 23.1 and to intervene in the action under Chancery Court Rule 24.[3] The original parties opposed the motion to vacate, claiming first that because News brought, or intended to bring, an individual and not a derivative action, Rule 23.1 did not apply, and second that there was no independent basis for intervention.

Shortly thereafter, the Proposed Intervenors and several other Warner shareholders commenced new actions in the Court of Chancery and in courts of New York and California challenging both the Warner/Chris-Craft exchange agreement and the Warner/News settlement agreement. In these actions, News was designated as a defendant, along with Warner, Chris-Craft, and BHC, on the ground that it conspired with Warner in Warner's breach of fiduciary duty.

In response to the Proposed Intervenors' motion to intervene and vacate the stipulation of dismissal, the Court of Chancery found that while News' complaint supports derivative as well as individual causes of action, News could and did proceed with its individual action only, noting that the complaint alleges "special injury" to News' contractual voting rights in Warner. The Court accordingly concluded that dismissal of News' suit was not subject to the notice and court approval provisions of Rule 23.1,

**2.** Chancery Court Rule 41(a)(1) provides:
    (a) Voluntary Dismissal; Effect Thereof.
    (1) By Plaintiff; by Stipulation. Subject to payment of costs and the provisions of Rule 23(e) and Rule 23.1 an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs or (ii) by filing a stipulation or dismissal signed by all the parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

**3.** Chancery Court Rule 24 provides in pertinent part:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) When a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) When a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the Court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

and it denied the Proposed Intervenors' motion. *See News International, plc v. Warner Communications, Inc., et al.,* Del.Ch., C.A. No. 7420, slip op. at 5–9 (Walsh, V.C.) (April 10, 1985) (unreported decision).

## II.

■ To determine whether a complaint states a derivative or an individual cause of action, we must look to the nature of the wrongs alleged in the body of the complaint, not to the plaintiff's designation or stated intention. *Elster v. American Airlines, Inc.,* 34 Del.Ch. 94, 100 A.2d 219, 223 (1953); *Moran v. Household International, Inc.,* Del.Ch., 490 A.2d 1059, 1069–70 (1985). In *Elster,* the Court of Chancery established that a stockholder can maintain an individual action against the corporation if he has sustained a "special injury," which the Court impliedly defined as "a wrong inflicted upon him alone or a wrong affecting any particular right which he is asserting,—such as his preemptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation." 100 A.2d at 222.

In *Moran,* the Court of Chancery set forth a test to determine whether a plaintiff has established an individual action:

> To set out an individual action, the plaintiff must allege either "an injury which is separate and distinct from that suffered by other shareholders," . . . or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation.

490 A.2d at 1070 (quoting 12B *Fletcher Cyclopedia Corps.* § 5921, at 452 (Perm. Ed.1984)) (citations omitted).

■ In comparing the two-pronged test of *Moran* with the definition of the term "special injury" in *Elster,* it appears that the term encompasses both prongs of the *Moran* test. That is, a plaintiff alleges a special injury and may maintain an individ-ual action if he complains of an injury distinct from that suffered by other shareholders or a wrong involving one of his contractual rights as a shareholder. Moreover, while *Moran* serves as a quite useful guide, the case should not be construed as establishing the only test for determining whether a claim is derivative or individual in nature. Rather, as was established in *Elster,* we must look ultimately to whether the plaintiff has alleged "special" injury, in whatever form.

The plaintiffs in *Moran* alleged, *inter alia,* that a majority of the corporation's directors had "manipulated the corporate machinery to entrench themselves in office by restricting the shareholders' right to make use of the proxy machinery to gain control of" the corporation. 490 A.2d at 1070. The Court of Chancery found that because the plaintiffs were not engaged in a proxy battle, they suffered no injury distinct from that suffered by other shareholders. In addition, the Court found that while the plaintiff corporation was the defendant corporation's largest shareholder, holding approximately 5% of the latter's stock, it did not suffer any unique harm merely by virtue of its holdings because it had alleged no intent to use its block position to gain control of the defendant corporation. The Court, therefore, required that the claim be brought derivatively. *Id.*

■ A review of the allegations in News' complaint in the case now before us reveals that the complaint clearly supports individual as well as derivative causes of action. News alleges that the Warner/Chris-Craft exchange agreement: (1) was designed to entrench management; (2) constituted a gross waste of corporate assets; (3) undermined Warner shareholders', and in particular News', voting and other fundamental shareholder rights; and (4) was specifically aimed at preventing News from exercising its 7% interest and influencing Warner management.

Following the precedent established in *Moran* and discussed above, News has not

suffered any distinct harm merely by virtue of its 7% stock interest in Warner, because as of the time of the complaint News had not indicated a desire to use its holdings to gain control of the corporation. However, unlike the plaintiffs in *Moran*, News alleges harm to one of its contractual rights. Specifically, it contends that the Warner/Chris-Craft exchange agreement violated its voting rights by securing for Warner management veto power over all shareholder actions subject to the 80% supermajority voting requirement. We find that this allegation constitutes special injury to News under *Elster*, thus forming the basis of a viable individual cause of action against Warner. The right to vote is a contractual right that News possesses as a shareholder of Warner which is independent of any right of Warner. The alleged interference with that right meets the requirements of *Elster* and *Moran* in setting forth an individual action.[4] A shareholder who suffers an injury peculiar to itself should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong. *See also Reifsnyder v. Pittsburgh Outdoor Advertising Co.*, 405 Pa. 142, 173 A.2d 319 (1961) (Pennsylvania Supreme Court found a direct, or individual, action, concerned primarily with the protection of the plaintiff's voting rights, where plaintiff alleged that his own votes had been wrongly diluted by the majority shareholder's improper votes on a resolution in which the majority shareholder had a pecuniary interest). *Cf. Colonial Securities Corporation v. Allen*, Del.Ch., C.A. No. 6778 (Longobardi, V.C.) (April 18, 1983) (unreported decision) (Court of Chancery stated as dicta: "If the Plaintiff had sought to enjoin the ... vote due to the potential coercive effect of these agreements, that action might have appeared as a personal one to vindicate the right of the plaintiff and other

stockholders' [sic] to vote freely, a right which is theirs and not the corporation's.") *Elster's* dicta, previously referred to, supports the same result in the instant case. Here, the amended complaint clearly sets forth a challenge by News for the control of Warner and Warner's efforts to frustrate News' challenge, in addition to a claim for breach of News' contractual rights. Further, we note that counsel for Warner argued below, on a preliminary motion to dismiss for failure of News to make pre-suit demand on the Board of Warner, that the complaint "studiously avoids any claim for derivative relief [because] Murdoch doesn't want to be a derivative plaintiff."

■ Having concluded News pleaded claims that support both individual and derivative causes of action, we must now determine whether News proceeded with its individual action only. If it did, then it was not required to comply with the provisions relating to derivative actions in Chancery Court Rule 23.1. As the Court of Chancery stated in *Elster*:

> In such case a stockholder, if he should so desire, may proceed on his claim for the protection of his individual rights rather than in the right of the corporation. The action would then not constitute a derivative action.

100 A.2d at 222.

We believe the Court of Chancery was correct in concluding that News proceeded with its suit individually and not on behalf of Warner. At no time did News make any effort to comply with the demand requirements of Rule 23.1. In fact, rather than plead futility of demand, News argued that it need not comply with Rule 23.1 because it brought individual claims. While such an argument cannot create an individual action where the complaint does not support one, it is an indication that a plaintiff

---

4. It is important to note that, while the substantive validity of News' allegation of interference with its right to vote may be doubtful (i.e., News was still able to exercise its vote and Chris-Craft was not obligated to vote its shares with Warner management), the inquiry here is to the nature of the claim and not to its merit. The plaintiff need not prove the wrong; all he need do is allege it. *Moran*, 490 A.2d at 1070.

is pursuing individual, and not derivative, claims.

The Proposed Intervenors argue that News made statements in its press releases and in its complaint that exhibited concern for the interests of all Warner shareholders and not merely for itself, and that it therefore was proceeding derivatively. As the Court of Chancery noted, it was not unusual for News to comment on the plight of shareholders in general in order to gain public support in its fight against Warner management. The Court stated: "Litigation over corporate control is usually accompanied by orchestrated public relations efforts designed to picture each side as the champion of shareholder interests." *News International, plc v. Warner Communications, Inc.*, Del.Ch., C.A. No. 7420, slip op. at 7 (Walsh, V.C.) (April 10, 1985) (unreported decision).

We find that News proceeded with its individual action only, and that therefore it was not required to comply with the notice and court approval provisions of Rule 23.1 in dismissing its action against Warner.

Further, we cannot support the proposition that the mere finding of a derivative claim within a plaintiff's complaint that also states individual claims for relief compels a ruling that Rule 23.1 necessarily applies to a dismissal with prejudice of the individual claims for relief. A shareholder whose complaint arguably asserts both derivative and individual claims but who eschews any effort to proceed derivatively should be permitted to resolve his individual claim, provided it does not prejudice or adversely affect the viability of a perceived derivative claim.

Here, it is clear from the record that the claims that were dismissed with prejudice were individual claims and not derivative claims; and defendants have stipulated, as well as represented to this Court, that any derivative claims asserted shall survive without prejudice *and* that the defendants remain subject to the Trial Court's jurisdiction for resolution of all such derivative claims. Since the perceived derivative claims stated in the amended complaint remain vaiable and pending, the Court of Chancery did not commit legal error or abuse its discretion in dismissing with prejudice the individual claims asserted based on the private suit settlement reached by the parties. For these reasons, we conclude that the stipulation of dismissal must stand.

### III.

The Proposed Intervenors also argue that they should be permitted to intervene in this action under Chancery Court Rule 24 in order to vacate the stipulation of dismissal and prosecute the derivative claims against Warner as well as new claims against News. In general, intervention is allowed only in pending actions. *Braasch v. Mandel*, 40 Del.Ch. 12, 172 A.2d 271, 273 (1961). Because we now uphold the dismissal of News' action, that action is no longer pending. An exception to the rule may exist, however, for "the reopening of judgments entered by reason of collusion and fraud between the parties to the prejudice of intervenors' rights." *Id.* 172 A.2d at 274. This exception does not apply here. Because News and Warner were free to stipulate to a dismissal of this action without complying with Chancery Court Rule 23.1, as we have found above, there is no improper conduct to warrant intervention under the exception. Moreover, as noted, the dismissal of News' individual action will not prejudice the rights of the Proposed Intervenors nor of any Warner shareholder other than News. They are still free to pursue derivative claims arising out of the Warner/Chris-Craft exchange agreement or the Warner/News settlement agreement. In fact, several such actions have already been filed in the Court of Chancery and in courts of other states. The Proposed Intervenors must look to those actions to pursue their claims.

\* \* \*

AFFIRMED.

MOORE, Justice, concurring.

I concur in the judgment. But for (1) the pendency of companion actions in the Court of Chancery, at least two of which were brought by the intervenors, (2) the representations made to us at reargument that News would unconditionally submit itself to the jurisdiction of the Delaware Courts in those actions, and (3) the trial court's ruling that the settlement and dismissal of this case will not prejudice the rights of any Warner shareholders, other than News, to pursue their pending claims in those actions, I doubt that today's result would have obtained.

Nonetheless, my concerns are several, and they persist. Because of their apparent pragmatic result, both the majority opinion and that of the trial court may be interpreted as sanctioning one rule for the large shareholder litigant, who by guile and artful pleading gives the impression of championing the rights of all stockholders without any such intention, while the small stockholder is firmly held to the strictures of Chancery Rule 23.1. Future reliance on this case as creating that sort of distinction, thus opening the door to collusive settlements, would be ill-advised and contrary to our earlier warnings in *Wied v. Valhi, Inc.*, Del.Supr., 466 A.2d 9, 15 (1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). Carried to its ultimate conclusion, any such principle would destroy the efficacious intent of Rule 23.1.

The troubling aspects of this case are both factual and legal. In its pleadings, other filings, and the public statements of its chairman and managing director, Mr. K. Rupert Murdoch, News clearly conveyed the message that it was bringing this action to vindicate the rights of all Warner shareholders, and to protect Warner as a corporate entity. In that regard Mr. Murdoch's statements were widely and carefully directed to appropriate audiences. The Wall Street Journal reported him to say:

"We've decided to fight but we haven't settled on our tactics or.... As far as

I'm concerned, this has been a dirty deal done to me and all the shareholders. I'm going to fight it in every court and agency I can, and if necessary before all the [Warner] shareholders."

In connection with his efforts to have the Federal Communications Commission block the proposed transaction, Mr. Murdoch stated that it "is not in the best interest of Warner and its stockholders." Speaking to the New York chapter of the Public Relations Society of America, Mr. Murdoch said:

"We will oppose and expose gross mismanagement, fraud, racketeering and abuse of shareholder funds wherever we find it."

In the Chicago Tribune Mr. Murdoch termed the Warner/Chris-Craft agreement "a rinky-dink deal, a terrible one for Warner's shareholders ... We'll go to every court in the country to stop it", and that Warner "should be protected at all costs." Finally, he observed of those controlling Warner that he had "never seen such mismanagement and corporate waste."

In its Schedule 13D filings with the Securities and Exchange Commission, News represented that its acquisition of Warner stock was "to make an investment" with no "present intention to seek to acquire control of [Warner] or to request representation on [its] Board of Directors." While News reserved the right to take any action deemed "necessary or desirable" to protect its investment, the disclaimer of any intent to acquire control or seek representation on Warner's Board was repeated in both the original filing and a subsequent amended Schedule 13D.

Although there was a later filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 with the Federal Trade Commission and the Antitrust Division of the Department of Justice, which could imply that News might attempt to gain control of Warner, News did not mount any effort to actually do so.

Through artful drafting, News' complaint in the Court of Chancery appears to speak derivatively on behalf of the corporate enterprise, while subtly mixing in certain language upon which it now relies to stake out "individual" claims. Thus, we find such allegations as:

"Warner's Wasteful Give-Away of Corporate Assets, Including Control

\* \* \* \* \* \*

29. The Exchange Agreement reveals a gross waste of corporate assets, lacks any valid business purpose and is obviously intended to entrench Warner's management to the detriment of Warner shareholders. It is clearly aimed at countering any effort of plaintiff to acquire a voice in management of Warner. Warner is required by the Exchange Agreement to issue to BHC 15.2 million shares of a new series of non-convertible preferred stock, with 19% of the total Warner voting power (21.9% of dividends are in default) which cannot be diluted irrespective of how many additional voting shares are issued in the future by Warner, with a dividend of 12% (or $33.1 million per year) or 1% over a prime rate (whichever is higher) and in a form which cannot be redeemed at any time. The Warner non-convertible preferred has 1 vote per share (1.2 votes in the event of 2 quarterly dividend defaults) and an absolute veto on any dividend to Warner's common shareholders except cash dividends below a defined amount, and dividends payable in common stock.

\* \* \* \* \* \*

37. In addition, Warner's management has put in jeopardy Warner's filmed entertainment operations, acknowledged to be among the company's most valuable assets, while dissipating the company's assets on Atari and other unprofitable adventures including the Proposed Transaction. Since the filmed entertainment operations constitute a substantial portion of Warner's shareholders equity, it is abusive and wasteful

for Warner management to put them in such jeopardy.

## COUNT I

### THE PRIMARY PURPOSE OF THE PROPOSED TRANSACTION IS TO ENTRENCH WARNER MANAGEMENT

\* \* \* \* \* \*

39. The Proposed Transaction has been entered into by Warner management for the primary purpose of entrenching Warner management in their enormously lucrative positions of employment. Moreover, although the Proposed Transaction would damage all Warner shareholders other than the defendants by improperly hindering their ability to control or replace present Warner management, the Proposed Transaction is specifically designed to ensure that plaintiff cannot exercise the rights that accompany its 7% interest in Warner.

\* \* \* \* \* \*

41. Because the Proposed Transaction and the Exchange Agreement have been agreed to by Warner management for the sole purpose of entrenching itself and would have the effect of minimizing or eliminating plaintiff's and other shareholders' voting and other rights in Warner and was especially intended to thwart plaintiff's right to seek to replace current management, consummation of the Proposed Transaction would violate plaintiff's rights as a shareholder of Warner.

\* \* \* \* \* \*

## COUNT II

### THE PROPOSED TRANSACTION DISENFRANCHISES WARNER SHAREHOLDERS AND IS CONTRARY TO DELAWARE LAW

\* \* \* \* \* \*

45. If, after having caused the corporation to adopt the super-majority voting

requirements described above in paragraphs 19 to 23, management is permitted to proceed with the Proposed Transaction, thereby placing a bloc of twenty percent or more of Warner's stock with management and its "co-venturer" Chris-Craft, then the remaining shareholders (who are 100% of its present shareholders), even if in unanimous agreement, would thereafter be prevented from causing the company to pursue certain courses of action which it may now pursue by an 80% vote of shareholders.

\* \* \* \* \* \*

46. The attempted creation of such new strictures on the voting rights of existing shareholders without first seeking shareholder approval violates fundamental principles of Delaware law.

\* \* \* \* \* \*

### COUNT III

CONSUMMATION OF THE PROPOSED TRANSACTION WOULD CAUSE WARNER TO BREACH ITS CONTRACT WITH PLAINTIFF TO MAINTAIN WARNER'S NEW YORK STOCK EXCHANGE LISTING

\* \* \* \* \* \*

52. Warner's proposed issuance of the non-convertible Preferred infringes upon the voting rights of and discriminates against existing shareholders, including plaintiff, by substantially reducing, if not eliminating, shareholder voting rights in Warner without shareholder approval, and renders the acquisition of shares of common stock less attractive to plaintiff and any other person who might seek to acquire an interest in Warner.

\* \* \* \* \* \*

62. The Proposed Transaction is, indeed, a sham designed to thwart plaintiff (or involves the issuance of voting debt in violation of Delaware law) and was intended to minimize and thwart plaintiff's right as a shareholder to seek to influence the management of Warner.

63. Since the true nature of the Proposed Transaction is not what it has been reported to be, it can be said to constitute a fraud upon plaintiff and Warner's other public shareholders.

The testimony of one of Mr. Murdoch's chief financial officers supports the derivative nature of News' claims. Thus, Richard A. Sarazen, Director/Executive Vice President—Finance of News America Publishing Incorporated, a News affiliate, testified:

Q. Is it your belief that Warner grossly overpaid for the position in BHC that is contemplated by this transaction?

A. Yes.

Q. I suppose you also believe that that is detrimental to the interests of all Warner shareholders; is that correct?

A. Yes, I do.

Q. Do you think that the fact, as you believe it to be, that Warner grossly overpaid for the interest in BHC particularly affects Mr. Murdoch more than other shareholders?

A. Yes, but only to the extent that we have a larger shareholder than other shareholders.

Q. It affects all the shareholders equally on a share-for-share basis, but you have more shares; is that what you are saying?

A. Yes.

\* \* \* \* \* \*

Q. Is it true that the Murdoch companies currently are concerned or unhappy about the various provisions in the articles and bylaws of Warner Communications that provide for 80 percent vote levels with respect to certain kinds of events?

A. What does "concerned" mean?

Q. Unhappy.

A. Yes.

Q. All right.

Isn't it the Murdoch companies' view that these provisions are unfair to all the shareholders of Warner Communications?

A. Yes.

Q. Would it be correct to say that the Murdoch companies believe that the primary purpose of the Chris-Craft transaction is to entrench the existing management of Warner Communications?

A. Yes.

Q. I take it it is also fair to say that it is the Murdoch companies' view that that is unfair to all shareholders of Warner Communications; is that correct?

A. Yes.

Q. Is it true, to your understanding, that there is concern by Murdoch companies about the possible impact on New York Stock Exchange listing of the common shares as a result of the Chris-Craft proposed transaction?

A. Yes.

Q. If Warner would be delisted, that would have a bad impact in the Murdoch companies' views on all shareholders; is that correct?

A. Yes.

Q. Isn't it true that the Murdoch companies believe that the Chris-Craft transaction, in effect, affects the voting rights of all shareholders of Warner Communications?

A. Yes.

In affidavits filed on News' behalf by its investment bankers, a similar theme of damage to Warner and all its stockholders was stressed. Stanley S. Shuman of Allen & Company stated:

"[T]he transaction is grossly unfair to Warner and its shareholders.

\*　\*　\*　\*　\*　\*

Thus, whether one views this transaction from the perspective of the value of what Warner is to give up or the perspective of the value of what it will receive in return, the transaction is grossly unfair to Warner shareholders. The minimum difference between the value of Warner's contribution and the value of the consideration it is to receive is $90 million.

Arthur H. Rosenbloom of MMG Capital Corporation, opined that the Warner/Chris-Craft deal:

[I]s materially unfair to Warner and its shareholders from a financial point of view.

\*　\*　\*　\*　\*　\*

In light of our conclusions that the fair market value of the BHC securities to be received by Warner in the Proposed Transaction is about $115 million less than those to be transferred by Warner to BHC; the potentially materially dilutive loss to Warner's shareholders by reason of BHC's put option; the current year's earnings per share dilution to be sustained by Warner as a result of the Proposed Transaction; and the materially greater market capitalization of the Warner common into which the Warner convertible preferred converts versus Chris-Craft's total market capitalization, we, in our professional judgment, believe that the transaction is materially unfair to Warner and its shareholders.

Given the foregoing record, including the fact that News never actually attempted to gain control of Warner, and thus be in a position to claim a distinct injury to its stock position, I find it very difficult to square what was permitted here with the trial court's earlier conclusions in *Moran v. Household International, Inc.,* Del.Ch., 490 A.2d 1059, 1070–71 (1985), *aff'd,* Del. Supr., 500 A.2d 1346 (1985). There, the Court of Chancery ruled:

Plaintiffs' complaints, fairly read, reflect causes of action which are derivative in nature, not individual. Moran's first claim alleges that a majority of Household's directors manipulated the corporate machinery to entrench themselves in office by restricting the shareholders' right to make use of the proxy machinery to gain control of Household.

\*　\*　\*　\*　\*　\*

Because the plaintiffs are not engaged in a proxy battle, they suffer no injury distinct from that suffered by other shareholders as a result of this alleged

restraint on the ability to gain control of Household through a proxy contest. Furthermore, although D–K–M is Household's largest shareholder, holding approximately 5% of its stock, it does not suffer any unique injury merely by virtue of its holdings. There is no allegation that D–K–M desires to employ its block position as a means of gaining control of Household. I conclude, therefore, that this claim must be brought derivatively.

The plaintiffs' second cause of action alleges a manipulation of corporate machinery which acts to deprive shareholders of their right to receive and consider takeover proposals. Although the Plan may indeed have the effect of limiting a shareholder's ability to consider takeover proposals, shareholders do not possess a contractual right to receive takeover bids. The shareholders' ability to gain premiums through takeover activity is subject to the good faith business judgment of the board of directors in structuring defensive tactics. Absent an allegation that the Rights Plan directly restricts transferability, there is no deprivation of a distinct contractual right of the shareholders. Because plaintiffs do not allege any distinct injury from the alleged restriction on their ability to receive takeover bids, this claim may only be brought derivatively on behalf of Household.

The third cause of action alleges that the issuance of the rights is invalid under Delaware law. This claim clearly is derivative since it calls into question the authority of the Board to alter the capital structure of the corporation, not any contractual right of the shareholders or any distinct injury to the plaintiff. 490 A.2d at 1070–71.

Indeed, at reargument counsel for Warner admitted to having had a difficult time distinguishing this case and *Household,* and neither Warner nor News ever satisfactorily explained the difference. Thus, I find it a very slender reed to justify the result here by grasping at the dicta in

*Elster v. American Airlines,* 34 Del.Ch. 94, 100 A.2d 219, 222 (1953), that:

There are cases, of course, in which there is injury to the corporation and also special injury to the individual stockholder. In such case a stockholder, if he should so desire, may proceed on his claim for the protection of his individual rights rather than in the right of the corporation. The action would then not constitute a derivative action. 100 A.2d at 222.

While I accept the foregoing principle, it seems to me that when a party seeks to enforce, solely as an individual claim, one having derivative implications, equity and fairness require that the plaintiff so state—clearly and without equivocation—in order that other stockholders may not be led to believe that their rights are being championed when the opposite is the case. This Court's mandate in *Schnell v. Chris-Craft Industries, Inc.,* Del.Supr., 285 A.2d 437, 439 (1971), that "inequitable action does not become permissible simply because it is legally possible", finds considerable application to such circumstances.

I suggest no criticism here. My concern is for the future. Delaware has a proud record of preserving shareholder rights in derivative actions even when dismissal was technically warranted. *See Hutchison v. Bernhard,* 43 Del.Ch. 139, 220 A.2d 782, 784 (1965). Certainly in the past the Court of Chancery has been loath to permit private settlements between litigants in actions having representative overtones. This is so even though the Court has noted the parties' good faith and complete candor. *See Raynor v. LTV Aerospace Corporation,* Del.Ch., 317 A.2d 43, 44 (1974).

It would be unfortunate if this case was viewed as authority presaging a means for the destruction of Chancery Rule 23.1. I do not believe that is the intent, and I trust it will not be the result—and all the latter would imply for the future of Delaware corporate law.