In re WORLDCOM, INC., et al.,
Reorganized Debtors.

No. 02–13533 (AJG).

United States Bankruptcy Court,
S.D. New York.

April 26, 2005.

**846**

Weil, Gotshal & Manges LLP, Marcia L. Goldstein, Esq., Lori R. Fife, Esq., New York City, Of Counsel, Alfredo R. Perez, Esq., Houston, TX, Of Counsel, Adam P. Strochak, Esq., Of Counsel, Washington, DC, for the Reorganized Debtors.

Arent Fox PLLC, Edward S. Feig, Esq., Silvia S. Duarte, Esq., Of Counsel, New York City, for Richard F. Reynolds.

## MEMORANDUM OPINION REGARDING DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING ENFORCEMENT OF AUTOMATIC STAY WITH RESPECT TO PROSECUTION OF DERIVATIVE ACTION BY RICHARD F. REYNOLDS

ARTHUR J. GONZALEZ, Bankruptcy Judge.

WorldCom, Inc. ("WorldCom") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively referred to as the "Debtors" herein at all times pre- and post-petition) seek to enforce the automatic stay[1] with respect to the prosecution of a derivative action by Richard F. Reynolds (the "Reynolds Action").

### I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334 and 157 of title 28 of the United States Code. This matter is a core pro-

---

1. For the reasons discussed in further detail below, the Debtors' request to enforce the automatic stay will be viewed as a request to enforce the injunction provided for in the Debtors' plan of reorganization.

ceeding within the meaning of section 157(b) of title 28 of the United States Code. Venue is properly before this Court, pursuant to sections 1408 and 1409 of title 28 of the United States Code.

## II. Background

During September 1998, MCI Communications Corporation ("MCI") merged with and into TC Investments Corp., a Delaware corporation, wholly owned subsidiary of WorldCom. As a result of the merger, MCI became a wholly-owned subsidiary of WorldCom, and the shareholders of MCI ultimately received common shares of WorldCom. During 2001, WorldCom approved a recapitalization of its shares of common stock and created two new series of common stock—(1) the WorldCom Group tracking stock (the "WCOM Shares") and (2) the MCI Group tracking stock (the "MCIT Shares"). As a result of the recapitalization, each outstanding share of WorldCom common stock was converted into one WCOM Share and one-twenty-fifth (1/25) of one MCIT Share. At the time of recapitalization, WorldCom announced that the MCIT Shares "[e]xpected [a] quarterly dividend of $0.60 per share paid at the discretion of our board of directors." On October 15 and September 28, 2001, and December 31, April 15, and March 31, 2002, WorldCom paid the holders of the MCIT Shares a quarterly dividend of $0.60.

Mr. Reynolds alleges that between April 2001 and April 2002, at the direction of Scott D. Sullivan,[2] David F. Myers[3] directed employees of the General Accounting Department of WorldCom to transfer approximately $3.8 billion in operating expenses to capital accounts, which resulted in the overstatement of WorldCom's earnings. Mr. Reynolds alleges that no rationalization was given for the transfer of these operating expenses and that other employees of WorldCom had knowledge that accounting irregularities existed at WorldCom.

On June 25, 2002, WorldCom announced that approximately $3.825 billion in operating expenses were transferred improperly to capital accounts during 2001 and 2002. Between June and September 2002, WorldCom announced that an additional $3.3 billion in operating expenses was transferred improperly to capital accounts during 1999 and 2000.

Mr. Reynolds alleges each member of the Board had actual or imputed knowledge that WorldCom's financial statements were overstated and that the financial records of WorldCom did not accurately reflect the financial condition of WorldCom. Mr. Reynolds further alleges that notwithstanding this knowledge, on or about March 6, 2002, the Board declared a quarterly dividend for the MCIT Shares (the "July 15 Dividend"). On March 7, 2002, WorldCom announced that the Board declared the July 15 Dividend of $0.60 per MCIT Share that would be paid on July 15, 2002 to the shareholders of record as of the close of business on June 30, 2002.

Mr. Reynolds alleges that following the announcement of the July 15 Dividend, some directors of the Board sold large amounts of MCIT Shares at a price which was inflated based on the announcement of the July 15 Dividend.

---

**2.** Mr. Sullivan who was a director of WorldCom from 1996 until June 2002 and was Chief Financial Officer, Treasurer, and Secretary of WorldCom from December 1994 until June 2002 is a defendant in the Reynolds Action.

**3.** Mr. Myers who was the Vice President and Controller of WorldCom during all relevant times is a defendant in the Reynolds Action.

On May 21, 2002, WorldCom announced that the Board unanimously approved the consolidation of the WCOM and MCIT Shares effective July 12, 2002 (the outstanding MCIT shares would be converted into WCOM shares at a specified ratio). WorldCom confirmed that the holders of record of the MCIT Shares would be paid the July 15 Dividend notwithstanding the conversion. On June 14, 2002, WorldCom's annual meeting was held where each of the ten incumbent members of the Board was re-elected.

On June 25, 2002, WorldCom announced that it intended to restate its financial statements for 2001 and the first quarter of 2002. Further, WorldCom also announced that it had terminated the employment of Mr. Sullivan and that Mr. Myers resigned. As a result of this announcement, the Nasdaq National Stock Exchange halted the trading of WCOM Shares and MCIT Shares. On July 1, 2002, the day after the record date in connection with the July 15 Dividend, the WCOM and the MCIT Shares resumed trading. Further, on July 1, 2002, WorldCom announced again that it would reincorporate the MCIT Shares into WorldCom, and that it would pay the July 15 Dividend. On July 11, 2002, however, WorldCom announced that the July 15 Dividend would not be paid.

On July 21 and November 8, 2002, the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On October 29, 2002, this Court entered an order establishing January 23, 2003, as the bar date for filing proofs of claim. By entry of the Confirmation Order on October 31, 2003, this Court confirmed a plan of reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective Date"). Upon the Effective Date, the Debtors' name was changed to MCI WorldCom Communications, Inc.

The Reynolds Action was commenced on April 15, 2003 when Mr. Reynolds filed a complaint (the "Complaint") in the Superior Court of the District of Columbia (the "Superior Court") on behalf of himself and a putative class, consisting of the public shareholders of WorldCom, including the holders of the WCOM and the MCIT Shares which alleged four individual causes of action against the eleven members of the Board of Directors of WorldCom (the "Defendants"). The Reynolds Action was transferred and is currently pending before the United States District Court for the Southern District of New York entitled *Reynolds v. Allen,* No. 03 Civ. 9822(DLC), 2004 WL 405804 (S.D.N.Y.).

Each of the four causes of action arises from the facts discussed above. Count One and Count Two challenge the conduct of the Defendants that allegedly affected the individual rights of the holders of MCIT Shares to receive a dividend. Count Three and Count Four challenge the conduct of the Defendants that allegedly affected the individual rights of the holders of the WCOM and MCIT Shares to vote appropriately and to make an investment decision based upon accurate information.

The Debtors argue that the Reynolds Action is a derivative action and is, therefore, barred by the automatic stay. On March 19, 2004, the Debtors filed a motion to enforce the automatic stay with respect to the Reynolds Action (the "Debtors' Motion"). As the Plan has become effective since the commencement of this proceeding the Court treats the relief sought by the Debtors as a request to enforce the injunction provision in the Plan (the "Plan

Injunction").[4] On April 8, 2004, Mr. Reynolds filed an objection to the Debtors' Motion (the "Reynolds Objection"). A hearing was held on this matter on April 13, 2004.

## III. Discussion

The core allegation of the Reynolds Action is that the Debtors' former directors breached their fiduciary duties to the shareholders by authorizing the declaration of the July 15 Dividend to holders of the MCIT Shares January 2002, and then canceling the payment of that dividend in late June 2002 when the company was beset by the financial crisis that led to the filing of these chapter 11 cases less than a month later. The Debtors argue that Mr. Reynolds's claims are derivative and, therefore, should be subject to the Plan Injunction. Mr. Reynolds does not dispute that derivative claims are property of the estate. However, he contends that his claims are direct and, therefore, not subject to the Plan Injunction.

The distinction between derivative and direct claims is often convoluted and confusing. There are a number of different tests to determine whether a claim is derivative or direct.

Courts have held that a derivative action is one that is for injury that has fallen equally upon all stockholders while in a direct action the plaintiff-stockholder's injury is separate and distinct from that suffered by other stockholders. *See Bokat v. Getty Oil*, 262 A.2d 246, 249 (Del.1970).[5]

Another test to determine whether a stockholder's action is direct is based on whether or not the stockholder has alleged a "special injury." *See Lipton v. News International*, 514 A.2d 1075, 1078 (Del. 1986). Other courts have held that

> To set out an individual action, the plaintiff must allege either "an injury which is separate and distinct from that suffered by other shareholders," ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation.

*Moran v. Household Int'l Inc.*, 490 A.2d 1059, 1070 (Del.Ch.1985).

Finally, in a recent decision, the Supreme Court of Delaware, rejected tests presented in *Bokat* and *Lipton*, and stated that the proper test is whether the relief requested would go to or benefit the corporation. *Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031 (Del.2004). The court in *Tooley* ruled that the law to be applied in determining whether a stockholder's claim is derivative or direct "must turn *solely* on the following questions (1) who suffered the alleged harm (the corporation or the suing stockholders, individually), and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033. It has also been noted that

---

4. The Debtors' Plan of Reorganization states "Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order." *Id.* at ¶ 10.05.

5. Courts have recognized that Georgia courts would follow Delaware law if Georgia law fails to address a corporate law issue. *See Peller v. Southern Co.*, 911 F.2d 1532, 1536 (11th Cir.1990) (affirming a district court's "assum[ption] that Georgia would follow Delaware case law").

It must be emphasized that the derivative action is the assertion of a corporate cause of action for injury done to the corporation, not to the shareholders in their individual capacities. Actions to vindicate personal rights of a shareholder are "direct," not derivative, and must be prosecuted by the shareholder in his own right. Common examples of direct actions include suits to compel the payment of a dividend, to protest the issuance of shares impermissibly diluting a shareholder's interest, to protect voting rights or to obtain inspection of corporate books and records.

Michael P. Dooley, *Fundamentals of Corporation Law* at 301–302 (1995).

■ In addition, "courts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or prospective relief." *Grimes v. Donald,* 673 A.2d 1207, 1213 (Del.1996) (quoting the ALI's *Principles of Corporate Governance: Analysis and Recommendations* (1992)). Mr. Reynolds contends that the Complaint is comprised of direct actions to compel the payment of a dividend and to protect the voting rights of the putative class. The Debtors contend that the Complaint is comprised of derivative actions to collect damages as a result of the diminution in value of the shares. The Court must now turn to whether each count alleged in the Complaint is derivative or direct.

### 1. Count One

■ Mr. Reynolds contends that Count One relates to the right of shareholders to receive an unpaid dividend and, therefore, it is a direct claim. The Debtors argue that Count One is for a breach of a fiduciary duty, which runs to the corporation, and because Mr. Reynolds has not alleged any special injury, it is a derivative claim. Mr. Reynolds's first count alleges

[T]he members of the Board had financial or other interests that differed from the interests of the holders of MCIT Shares, and such members of the Board benefited from the declaration of the July 15 Dividend to the detriment of the holders of MCIT Shares.

As a result of this breach of fiduciary duty of loyalty by defendants, Plaintiff and the other holders of the MCIT Shares were denied the opportunity to take reasonable action in connection with their investment in WorldCom and were forced to make investment decisions based upon a distribution that was declared illegally, including the decision whether to purchase, to sell and/or retain the MCIT Shares. Accordingly, Plaintiff and the members of the MCIT Class that held MCIT Shares on June 30, 2002—the record date for the distribution—are entitled to receive damages from defendants in connection with the unlawful conduct of defendants.

The Complaint, ¶¶ 102–103.

■ Count One is unclear as to what type of damages Mr. Reynolds is requesting. However, in the Reynolds Objection and at the hearing, Mr. Reynolds asserted that Count One is meant to compel the payment of the July 15 Dividend from the Defendants. The Court will review Mr. Reynolds claim as presented in the Complaint and the characterization made to this Court in the Reynolds Objection and at the hearing in order to determine whether Count One is a derivative or direct action. The allegations in Count One discuss the various frauds and wrongdoings allegedly perpetrated by the Board, which if true are breaches of the Board's fiduciary duty. A breach of fiduciary duties generally runs to the corporation and not the shareholders. *See Phoenix Airline Servs. v. Metro Airlines,* 260 Ga. 584, 397 S.E.2d 699, 701 (1990); *Holland v.*

*Holland Heating & Air Conditioning Inc.,* 208 Ga.App. 794, 432 S.E.2d 238 (1993). Based on the allegations in the Complaint, the Court concludes that Mr. Reynolds is requesting relief for the Board's breach of its fiduciary duties, which runs to the corporation and not the individual. There is no dispute that the dividend could not have been paid under Georgia statutory law. Mr. Reynolds, however, argues that because the July 15 Dividend was not paid, the putative class has grounds to establish a breach of the Board's fiduciary duty to the shareholders in that they were intentionally mislead by the declaration and affirmations of the July 15 Dividend.

■ A direct action to compel the payment of the dividend only lies when a shareholder can establish that a dividend could have or should have been paid. *See e.g. In re Radiology Assocs., Inc. Litig.,* No. Civ. A. 9001, 1990 WL 67839, at *14 (Del.Ch. May 16, 1990) (stating that the plaintiff's claim that illegal loans were directly responsible for the decrease of dividends was an individual action). Reynolds has not cited any cases that have directed the payment of illegally declared dividends. Mr. Reynolds's theories of liability are convoluted. The Complaint is not clear on the type of damages he is seeking; however, at the hearing and in the Reynolds Objection he claims that Count One is seeking to compel the payment of the July 15 Dividend. The Reynolds Objection appears to either (i) ask that the Court constructively treat the July 15 Dividend as a properly authorized dividend that was not paid, and then interpret Count One as seeking to compel payment from the Defendants, or (ii) ask the Court to treat an illegally declared dividend having been paid, and interpret Count One as seeking to allow the putative class to step into the shoes of the corporation as if the corporation had actually made the payment of the

dividend to seek its repayment. There is no precedent articulated, or in any way referenced, to support either of these theories or any other possible interpretation of the arguments raised regarding Count One.

■ The Court's determination of whether an action is derivative is made by looking at the nature of the wrong alleged and not the pleader's designation or stated intention. *Phoenix,* 397 S.E.2d at 701. In spite of Mr. Reynolds argument, at the hearing and in the Reynolds Objection, that he is seeking to compel the payment of a dividend, he has failed to provide any legal support for the proposition that a shareholder can compel the payment of an illegally declared dividend. Hence, when Count One is examined in the context of how it is pled, including that the relief sought has no basis other than that as a claim for the diminution in value of the shares, Count One is in essence a claim for the diminution in value of shares and not one for direct damages. Therefore, the Court finds that Count One is derivative and is barred by the Plan Injunction.

**2. Count Two**

■ Mr. Reynolds contends that Count Two is to compel the payment of a dividend and as such is a direct claim. The Debtors maintain that Count Two arises under Georgia law that makes the officers and directors liable to the corporation for improperly declared distributions, and it is, therefore, also a derivative claim. Mr. Reynolds alleges in Count Two that

> Section 14–2–832 of the Georgia Code provides that, if the unlawful distribution is paid to the shareholders by the corporation, each director who voted or assented to the distribution would be "personally liable to the corporation for the amount of the distribution that exceeds what would have been distributed

without violating Code Section 14–2–640"

. . . .

Based upon this right for payment of the July 15 Dividend (and the fact that WorldCom did not pay the July 15 Dividend), the holders of the MCIT Shares may enforce such right against defendants and defendants should be obligated to pay the holders of the MCIT Shares the amount of the July 15 Dividend.

The Complaint, ¶¶ 108 & 110.

At the hearing and in the Reynolds Objection, Mr. Reynolds characterizes Count Two as a request to compel the payment of dividends. Mr. Reynolds's allegation relies on Georgia statutory law. Section 14–2–832 of the Georgia Code provides that, if the corporation pays an unlawful distribution[6] to the shareholders, each director who voted or assented to the distribution would be "personally liable *to the corporation* for the amount of the distribution that exceeds what could have been distributed without violating [Georgia] Code Section 14–2–640." (emphasis added).[7] The Debtors correctly contend that the plain meaning of the statute only gives standing to the corporation to move in a derivative action if a distribution was improperly made. This statute does not provide standing to a shareholder to treat, in effect, a dividend as having been paid and then allow the shareholders to stand in the shoes of the corporation for the actual return of a constructive dividend from the directors. *See U.S. v. Adler*, 186 F.3d 574, 578 (4th Cir.1999) (holding that Georgia Code Section 14–2–640 creates liability of the directors to the corporation, and not to the corporation's creditors); *Hickman v. Hyzer*, 261 Ga. 38, 40, 401 S.E.2d 738 (1991) (holding that Georgia Code Section 14–2–640 is not a basis to pierce the corporate veil; rather it provides a method for a corporation to rescind improper payments to shareholders so that funds are available for payment of corporate debts). Here, the corporation would not have standing because the dividends were not paid. As discussed above, Mr. Reynolds is essentially arguing that the Court should treat the dividends as paid, giving the corporation standing, and then have the shareholders stand in the shoes of the corporation to recoup the constructive dividend for the shareholders on the theory that the corporation was not damaged because there was no actual payment. The circular nature of the construct demonstrates its absurdity.

Mr. Reynolds has not demonstrated how an individual shareholder can obtain standing under Georgia Code Section 14–2–640 under any circumstances. Moreover, the Court finds that there is no basis to find that this statute grants standing to a shareholder to collect an illegally declared, yet unpaid, dividend from a corporation's directors. Therefore, the Court finds that to the extent that any cause of action exists under Georgia Code Section 14–2–640 it is derivative and is barred by the Plan Injunction.

---

**6.** Section 14–2–140 of the Georgia Code defines the word "distribution" as meaning

[A] direct or indirect transfer of money or other property (except its own shares or rights to acquire its own shares) or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend . . . .

The declaration of the July 15 Dividend, therefore, was a declaration of a "distribution" for the purposes of Georgia statutory law.

**7.** Georgia Code Section 14–2–640 provides that directors of Georgia corporations would be prohibited from declaring a dividend if the distribution would not be in compliance with equity insolvency and balance sheet tests.

### 3. Count Three

Mr. Reynolds maintains that Count Three does not involve the diminution of value of WCOM and MCIT Shares. Rather, he argues, it involves the right of the shareholders of WorldCom to vote and make an investment decision regarding their WCOM and MCIT Shares based upon accurate information and requests damages realized by such shareholders as a result of the misleading disclosures by the members of the Board of Directors. Mr. Reynolds argues that Count Three is based upon the Board declaring (and twice confirming) the July 15 Dividend and not informing the holders of WCOM and MCIT Shares that the dividend might not be paid. The Debtors argue that Count Three is derivative because it is no different than a claim for diminution in value of the shares, which is a derivative claim. Count Three states

> If the Board announced prior to June 25, 2002 (the date that WorldCom announced that it would restate its earnings for 2001 and 2002), that the July 15 Dividend might not be paid, then the holders of the WCOM Shares and the holders of the MCIT Shares would have possessed material information that would have assisted them in deciding whether to sell their WCOM Shares and their MCIT Shares prior to June 25, 2002 (and receive the market price for their shares), or to retain their MCIT Shares (and receive the July 15 Dividend if paid by WorldCom). In contrast to the inability of the shareholders of WorldCom to make an informed decision, certain members of the Board (possessing information not available to the holders of the WCOM Shares and the holders of the MCIT Shares) sold a total of 4,244,829 WCOM Shares during 2002
>
> . . . .

> As a result of the violation of Section 14–2–830 of the Georgia Code and the breaches of the fiduciary duties of loyalty and disclosures by defendants, Plaintiff and the other members of the WCOM Class were denied the opportunity to take reasonable action in connection with their investment in WorldCom and were forced to make investment decisions based upon a distribution that was declared illegally . . . .

The Complaint, ¶¶ 115 & 118.

█ At the hearing and in the Reynolds Objection, Mr. Reynolds characterizes Count Three as based on the individual right of shareholders to make investment decisions based upon accurate information. Counts Three and Four rely on Georgia Code Section 14–2–830 which provides, in pertinent part "A director shall discharge his duties as a director, including his duties as a member of a committee . . . [i]n a manner he believes in good faith to be in the best interests of the corporation." Mr. Reynolds alleges that the Debtors had confirmed that it would pay the July 15 Dividend both before and after the Debtors had stated it would restate its earnings and never disclosed the possibility that such dividends would not be paid. Mr. Reynolds further alleges that had the holders of WCOM and MCIT Shares had such knowledge they would have possessed material information that would have assisted them in deciding whether to sell their shares prior to June 25, 2002 or retain their shares to receive the dividend.

The statute that Mr. Reynolds cites, states that the duty of good faith and best interest runs to the corporation. It does not state that it runs to the individual shareholders. Although the shareholders benefit from the Board's duty of fiduciary duties, they do so only indirectly, in that the duty is owed to the corporation. Therefore, any cause of action under Geor-

gia Code Section 14–2–852 is derivative and is barred by the Plan Injunction. The Court now turns to Mr. Reynolds's common law claim alleged in Count Three.

■■■ The Debtors argue that Mr. Reynolds's common law causes of action are derivative because the core grievance is that the shareholders were injured by fraudulent misrepresentations that caused the plaintiffs to continue to hold their WorldCom shares and resulted in the diminution in value of the shares. In response, Mr. Reynolds argues that he is not suing for diminution in share value but rather based on misrepresentations, which inflated the value of WorldCom shares and induced plaintiffs to hold their shares resulting in injury.

A similar argument was presented in *Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347 (5th Cir.1987), in a suit brought by a bank's shareholders against former officers and/or directors of the bank who were controlling shareholders. The *Crocker* court applied Mississippi law, which is similar to the law of Georgia and Delaware, in that it recognizes that a shareholder's action for injury "in the form of a diminution in the value of stock" must be brought in a derivative capacity. *Id.* at 349. In *Crocker*, the stockholder-plaintiffs argued that the controlling shareholders were able to reap a profit from the sale of their shares while depriving the plaintiff-stockholders of a similar opportunity, which injury the court labeled a "lost profit opportunity." *Id.* at 350. The Fifth Circuit, however, declined to distinguish the stockholder-plaintiffs claims from an ordinary claim based on diminution in value because the court found that "the end result was that all shareholders . . . lost the entire value of the stock." *Id.* at 350. The *Crocker* court found the stockholders claims too speculative because there was no contention that any stockholder "de-

sired specifically to sell their stock at a given point, but were deterred from effectuating a sale because of the misrepresentations." *Id.* at 351. Further, the *Crocker* court noted that the substance of the claim was that if the stockholders had known the true financial condition of the entity, they "would have sold their stock on an indefinite date, at an artificially (yet, unspecified) price" and realized a profit or minimized their loss. 826 F.2d at 350. Thus, as the *Crocker* court noted, this perceived profit opportunity was an "illusion" because the profit would only emanate from others being deceived by the scheme to artificially inflate the price of the stock. *Id.* at 351.

Further, the court in *Barsky v. Arthur Andersen, LLP*, Civ. Action No. H–02–1922 (S.D.Tex. Aug. 16, 2002) discussed a claim similar to this one in that the plaintiff was alleging that he based his investment decision on misstated financials and was therefore entitled to damages because he continued to hold his stock. The court held that the plaintiff did not allege any separate or special injury that was not shared by the shareholders generally and as such it was merely claim for diminution in value of the stock and, therefore, a derivative action.

In *Crocker*, the Fifth Circuit based its analysis on Mississippi law, which, similar to the law of the jurisdiction relevant to the issues before this Court, does not permit a party to maintain a direct action if the only injury alleged is diminution in stock value. As such, it would appear that the *Crocker* court would have applied the same analysis to the similar law before this Court. Here, as the court in *Crocker* had ruled, it is too speculative to determine whether a particular shareholder or group of shareholders would have changed their financial position had the information surrounding the July 15 Dividend been appar-

ent earlier. Mr. Reynolds must show that he and the class members had some desire or intention to sell their shares but they were deterred from effectuating a sale because of the misrepresentations, none of which was alleged here.

However, the Delaware Supreme Court in *Malone v. Brincat*, 722 A.2d 5 (Del. 1998) recognized the possibility for a shareholder to assert a direct action for a director's breach of fiduciary duty when making misrepresentations even in the absence of a request for a shareholder action. Although the *Malone* court did allow for the possibility that a direct action could be asserted by a shareholder based on a directors breach of its fiduciary duty to the shareholders in making false disclosures, the *Malone* court, nevertheless, recognized the continued viability of the distinction between direct and derivative actions and the need for a party to adequately set forth the predicates for the particular type of action pled. *Id.* at 14. In allowing the plaintiffs an opportunity to replead what appeared to be a derivative claim, the court noted, "[t]his will require an articulation of the classic 'direct v. derivative' theory." *Id.* at 14 fn. 45. The *Malone* court also acknowledged that damages based on "injury to the corporation" are derivative. *Id.* at 14. Further, as noted in *Barsky v. Arthur Andersen, LLP*, Civ. Action No. H–02–1922 (S.D.Tex. Aug. 16, 2002), *Malone* adhered to the requirement that the shareholder have a distinct and separate injury in order to bring a direct action. The *Barsky* court also noted that although *Malone* had been issued over six years ago, its influence in Delaware law has been negligible. *Id.* at 16. As stated earlier, and acknowledged in *Malone*, in cases where it is difficult to differentiate between derivative and direct actions, courts are more willing to consider an action as direct if the plaintiff is seeking equitable relief and not money damages. Here, Mr. Reynolds is only seeking money damages.

While leaving open the possibility that a direct cause of action could be pled, the *Malone* court did not set forth the parameters for asserting such a claim. Rather, the *Malone* court allowed plaintiffs in that case the opportunity to attempt to "articulate a remedy that is appropriate on behalf of the named plaintiffs individually or a properly recognizable class. . . ." *Id.* Moreover, the *Malone* court's recognition—that an allegation that "false disclosures resulted in the corporation losing virtually all its equity" sounded in "injury to the corporation" and was, therefore, a derivative claim—suggests that a different type of injury would have to be asserted to qualify it as a direct claim.[8] Therefore, a review of the complaints would be necessary to ascertain where they fit within "the classic 'direct v. derivative'" analysis. Here, Mr. Reynolds has asserted a claim that is no different than a claim for diminution in value of the shares. Therefore, the Court finds that Count Three is derivative and is barred by the Plan Injunction.

### 4. Count Four

██ Mr. Reynolds argues that Count Four involves a claim alleging a breach of the fiduciary duty of disclosure that affects the right to vote and to make an investment decision, and as such, is a direct claim. The Debtors contend that Count Four is distinguishable from the cases ruling that voting rights are direct claims. Mr. Reynolds Alleges in Count Four that

---

8. Requiring a distinct remedy is also consistent with the policy concern which mandates that recoveries obtained for injury to the corporation are assets of the corporation that are first distributed to creditors who supplied goods and services to the corporation and then to the owner-shareholders.

As a result of the violation of Section 14–2–830 of the Georgia Code and the breaches of the fiduciary duty of loyalty and disclosure by defendants, Plaintiff and the other members of the WCOM Class were denied the opportunity to take reasonable action in connection with their investment in WorldCom, including the nomination and election of individuals to the Board that faithfully would have represented the interests of the shareholders of WorldCom and would have paid the July 15 Dividend. Accordingly, as a result of the violation of statutory law and the breaches of the fiduciary duties, Plaintiff and the other members of the WCOM Class realized actual damages.

The Compliant, ¶ 124.

Mr. Reynolds at the hearing and in the Reynolds Objection characterized Count Four as seeking damages based on the shareholders' right to vote based upon accurate financial information. As discussed earlier to the extent that Mr. Reynold's claim is based on Georgia Code Section 14–2–830 which provides that directors owe a general duty of good faith to the corporation, such statute is not a basis for an individual action. As stated above, although the shareholders benefit from Georgia Code Section 14–2–852, they only do so indirectly.

The Mr. Reynolds maintains that to the extent that he is seeking damages based on voting rights, such action is a direct claim. *See News Int'l v. Warner Comm.*, Civ. Action No. 7420, 1985 WL 11558, at *1, 1985 Del. Ch. Lexis 442, at *6 (April 10, 1985) (ruling that the plaintiff alleged "special injury" to its voting rights when it alleged the defendant corporation's management secured veto power over all shareholder actions by acquiring an 80% supermajority of the stock). The cases cited by Mr. Reynolds dealing with voting rights deal with dilution of a shareholder's voting power or the ability for a shareholder to make an informed voting decision on a particular business decision of the corporation. *See e.g. In re Tri–Star Pictures Inc.*, 634 A.2d 319, 330 (Del.1993); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169 (Del.Ch., Jan.18, 1996). Mr. Reynolds is asserting that his vote regarding the Board would have changed based on accurate information. However, regardless of the outcome of that vote, the July 15 Dividend would not have been paid. This Court does not see how the right to vote, in this case, is differentiated from a diminution in value of the shares. Even if new directors had been elected, they could not have paid out the July 15 Dividend because it would have violated Georgia statutory law. The only legally cognizable monetary damage done to the shareholders is a loss in value of their shares, which, as discussed above, is not sufficient to establish a direct action but is rather derivative. Therefore, the Court finds that Count Four is a derivative claim and is barred by the Plan Injunction. Further, if the investment and voting claims asserted by Mr. Reynolds constituted individual claims as applied to the present facts, then any claim of fraud or misrepresentations by a board would inevitably constitute a direct claim on the theory that the alleged fraud and misrepresentation prevented shareholders from making decisions based upon accurate information.

### 5. Summary

■ Although Mr. Reynolds suggests that the claims are based on individual rights of the putative class (the right to dividends, invest, and vote), examination of each count reveals that the claims are based upon allegations of fraud and misrepresentation on the corporation that resulted in its diminution of value. As stat-

ed above, the Court's determination of whether an action is derivative is made by focusing on the nature of the wrong alleged and not the pleader's designation or stated intention. The Debtors correctly maintain that Mr. Reynolds is asserting claims for breach of fiduciary duties to the corporation and for the diminution of value of the shares. Further, the Debtors correctly maintain that the claims are not for the payment of dividends or voting or investment rights as suggested in the Reynolds Objection.

All of the facts cited in the Complaint are consistent with this Court's determination that the Complaint is, in essence, a derivative action. Each alleged fact demonstrates how each of the directors harmed the corporation through alleged fraudulent, misleading, or illegal activities. Further, the allegations contained on page twenty-seven of the Complaint, which state that directors of WorldCom sold WCOM shares after the announcement of the July 15 Dividend at an inflated price knowing that the July 15 Dividend would not be paid, does not give rise to an individual cause of action. Any claim therefrom is barred by the Plan Injunction.

## IV. Conclusion

In sum, the facts and allegations support the conclusion that none of the causes of action asserted by Mr. Reynolds allege a direct action within the meaning of *Tooley*. As discussed above, WorldCom has suffered the alleged harm and would be the proper beneficiary of any recovery or available remedy. Based upon the foregoing, the Court finds that the Reynolds Action is derivative and not direct. Therefore, any such action commenced was property of the estate and upon the effective date became property of the reorganized Debtors. As such the Debtors may only maintain the action, therefore, the Plan Injunction prevents Mr. Reynolds from proceeding with such action.

The Debtors are to settle an order consistent with this opinion.