BIG LOTS STORES, INC., Plaintiff,

v.

BAIN CAPITAL FUND VII, LLC, a Delaware Limited Liability Company; BCIP Associates II, a Delaware General Partnership; BCIP Trust Associates II, a Delaware General Partnership; BCIP Associates II–B, a Delaware General Partnership; BCIP Trust Associates II–B, a Delaware General Partnership; Sankaty High Yield Partnership II, L.P., a Delaware Limited Partnership; Michael L. Glazer, individually; Robert J. Feldman, individually; Joshua Beckenstein, individually; Matthew Levin, individually; and Robert White, individually, Defendants.

C.A. No. 1081–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 6, 2006.
Decided: March 28, 2006.

Norman M. Monhait, Rosenthal Monhait & Goddess, P.A. Wilmington, DE; Jeff J. Marwil, Barry Sullivan, James A. McKenna, Anders C. Wick, Jenner & Block, LLP, Chicago, IL, for the Plaintiff.

Robert K. Payson, Kevin R. Shannon, Bradley W. Voss, Potter Anderson & Corroon, LLP, Wilmington, DE; John K. Villa, Steven M. Farina, Williams & Connolly, LLP, Washington, DC, for the Bain Defendants and the Bain Director Defendants.

Lewis H. Lazarus, Thomas E. Hanson, Jr., Morris, James, Hitchens & Williams, LLP, Wilmington, DE; Thomas O. Kuhns, P.C, Thomas L. Campbell, Benjamin W. Hulse, Kirkland & Ellis, LLP, Chicago, IL, for Defendant Michael Glazer.

Barry M. Klayman, Wolf, Block, Schorr and Solis–Cohen, LLP, Wilmington, DE; Mitchell H. Kaplan, Wendy S. Plotkin, Choate, Hall & Stewart, LLP, Boston, MA, for Defendant Robert J. Feldman.

### OPINION AND ORDER

LAMB, Vice Chancellor.

In December 2000, in a sponsored management buyout transaction, a corporation sold a subsidiary business that operated a chain of toy stores. It received in exchange $257.1 million in cash and a deeply subordinated $45 million pay-in-kind note due in 2010. In 2002, the new owners refinanced the business and distributed approximately $120 million to the buyout sponsor, certain of its affiliates, two officers and directors of the subsidiary who invested in the buyout, and others. In 2004, the toy business filed a bankruptcy petition under Chapter 11 of the U.S. Bankruptcy Code.

As the holder of the $45 million note, the selling corporation is the largest unsecured creditor in the bankruptcy proceeding. Purporting to assert direct claims arising out of both the 2000 sale and 2002 refinancing, the seller brings this action asserting claims based on a variety of legal theories including breach of fiduciary duties, fraud, and civil conspiracy. The complaint seeks recovery for the amount due on the note and restitution for the alleged unjust enrichment of certain of the individual defendants.

In this opinion, the court concludes that it must grant the defendants' motions to dismiss. In sum, most of the plaintiff's claims are barred as a matter of law because they are derivative in nature, not direct, and thus belong to the bankruptcy estate. In more general terms, the underlying infirmity of the complaint is that the unavoidable effect of granting relief would be to unfairly advantage the plaintiff, an unsecured creditor, over any number of other unsecured creditors having claims in the bankruptcy. Simply put, this case stands for the well-established proposition that derivative claims cannot be used by a single creditor to upset the structured bankruptcy process. That principle equally applies when a plaintiff has erroneously characterized various derivative claims as direct, in the hope of escaping the broad jurisdiction of the bankruptcy court and the proceedings therein.

### I.

#### A. The Parties

The plaintiff in this case is Big Lots, Inc., a Ohio corporation with its principal place of business in Columbus, Ohio. Until December 2000, through its wholly owned subsidiary, KB Consolidated, Inc., Big Lots owned and operated more than 1,300 retail toy stores across the United States, Puerto Rico, and Guam under the names K*B Toys, K*B Toy Works, and K*B Toy Outlet. In addition, KB Consolidated conducted online sales of children's products under the name Kbkids.com.

The complaint identifies three discrete sets of defendants. First, Big Lots seeks recovery against Michael L. Glazer, a long-time manager and executive of the KB Toys companies. At all relevant times, Glazer was a director of Havens Corners Corporation ("HCC") and KB Holdings (now KB Toys, Inc.), as well as a chief executive officer of various of the KB companies, including HCC and KB Holdings.[1] Additionally, Glazer was a director of Big Lots at all times through May 20, 2003.[2]

Second, Big Lots brings claims against Robert J. Feldman, who, during the challenged events, was a manager and executive of the KB Toys companies. Further, Feldman was at all relevant times a director of HCC and KB Holdings, as well

---

1. Am. Compl. ¶ 11.

2. Id. at ¶ 105.

as chief financial officer of various of the KB companies, including HCC and KB Holdings.

Finally, the complaint sets out certain allegations against a group of individuals and entities affiliated with Bain Capital, LLC (together known in this opinion as the Bain defendants), a private equity investment firm.[3] The Bain director defendants include Joshua Beckenstein, Matthew Levin, and Robert White, who are alleged in some combination to have constituted the board of directors of KB Holdings, the ultimate parent of HCC and its affiliates.[4]

B. *The Facts*

During 2000, Big Lots received various indications of interest or offers for the KB Toys businesses, including an offer from one of its own directors, Glazer, to purchase KB Toys in a leveraged buyout transaction. Glazer ultimately withdrew his offer. But in December 2000, Big Lots entered into a stock purchase agreement to sell KB Consolidated and its operating subsidiaries to the Bain defendants, Glazer, Feldman, and other members of their management group. The transactional structure of this deal is complex, but is briefly summarized below.

1. *The 2000 Sale Of The KB Toys Businesses To Bain Capital*

Before 2000, the KB Toys businesses were wholly owned by Big Lots, then known as Consolidated Stores, Inc. The KB Toys structure at that point consisted of a holding company called KB Consolidated, which was directly owned by Consolidated Stores, and various operating companies positioned as subsidiaries of KB Consolidated.

The sale of KB Consolidated to the defendants took the form of a complicated multi-step transaction. First, Big Lots formed HCC, to which it transferred 100% of KB Consolidated's stock in exchange for all of the stock of HCC. This left the entire KB Toys structure described above as a subsidiary of HCC. The defendants created KB Holdings and its wholly owned subsidiary, KB Acquisition Corporation. The parties then consummated the transaction by transferring all of the stock of HCC to KB Acquisition for $257.1 million in cash and a $45 million pay-in-kind note issued by HCC and due in December 2010 (the "PIK Note").

At the conclusion of all related transactions, KB Holdings owned HCC, which held all the stock of KB Consolidated, which, in turn, wholly owned the various subsidiaries that operated the KB Toys businesses. In essence, the PIK Note became the obligation of a company (HCC) with no assets other than the stock of another holding company. From its inception and by its terms, therefore, the PIK Note was subordinated to the rights and claims of creditors of the operating companies held by KB Consolidated in any Chapter 11 proceeding.[5]

2. *The 2002 Transaction*

On April 23, 2002, KB Toys undertook a series of transactions which included the redemption and repurchase of shares of the KB Toys businesses, the restructuring of equity, and the payment of bonuses to more than 50 managers and senior execu-

3. Claims have also been filed against various Bain Capital affiliates, each of which is a private equity investment fund or other investment vehicle. *Id.* at ¶ 16.

4. *Id.* at ¶ 7.

5. Scaggs Aff., Ex. B § 5.

tives of the KB companies.[6] Briefly, KB Toys was able to do this by causing the operating subsidiaries to raise debt, part of which was paid immediately to executives as bonuses. The remaining additional funds were paid upstream to HCC, and then eventually to KB Holdings at the top of the corporate structure. KB Holdings then used these funds to repurchase 65% of its own outstanding stock from the Bain defendants, Glazer, Feldman, and other KB insiders. However the parties characterize these events, the fundamental purpose is clear—the 2002 transaction constituted a liquidity event which allowed Bain and its affiliates, as private equity investors, to withdraw certain sums of money from the KB Toys businesses.

Big Lots had no contractual rights in any capacity to block the 2002 transaction.[7] Nonetheless, on April 23, 2002, Feldman wrote to Charles Haubiel, General Counsel of Big Lots, certifying that following the repurchase agreement which constituted part of the 2002 transaction KB Holdings would continue to have a consolidated net worth of "not less than $20,000,000."[8] The complaint alleges that the purpose of this certification, although not required for any reason, was to induce Big Lots to "generally cooperate with and not object to or seek legal relief with respect to the [2002 transaction]."[9]

### 3. The KB Toys Bankruptcy

The complaint goes on to allege that the 2002 transaction left HCC and the operating subsidiaries on the brink of bankruptcy, insolvent, and unable to pay their obligations as they matured. In the words of the complaint:

> [t]he effect [of] the [2002 transaction] was to encumber substantially all of HCC's assets and to strip all of the value from HCC and the Operating Subsidiaries. The [2002 transaction] resulted in an enormous and unjustified return on the Defendants' investment in excess of . . . 900% in a mere 16 months, and ultimately resulted in HCC's default on Big Lots' $45 million HCC Note.[10]

Although it is conceded that KB Toys survived through the entire holiday season of 2002, and then the entirety of 2003, the complaint alleges that the 2002 transaction led directly to a Chapter 11 bankruptcy filing on January 14, 2004, some 22 months after the 2002 transaction. As a result of the bankruptcy,[11] the PIK Note became due and payable in the amount of approximately $57 million, consisting of $45 million in principal plus accrued interest.[12]

### II.

The amended complaint originally set out nine counts alleged against various of

---

**6.** The parties quibble as to what to call the set of transactions that occurred in 2002. The defendants prefer the label "recapitalization transactions." At oral argument, the plaintiff argued that this designation was misleadingly benign, masking the defendants' purported misconduct. The plaintiff's papers therefore refer to the 2002 transaction as the "equity distribution transaction." The court will avoid this tangential dispute over labeling by simply referring to these events as the "2002 transaction."

**7.** Big Lots received $1.95 million in the 2002 transaction in exchange for certain warrants

it had been issued in connection with the 2000 transaction, and which it was obligated to surrender under the "drag along" provision in its warrant holder agreement. Am. Compl. ¶ 35.

**8.** *Id.* at ¶ 36.

**9.** *Id.*

**10.** *Id* at ¶ 40.

**11.** *Id.* at ¶ 47.

**12.** *Id.* at ¶ 42.

the defendants. Count VI, a claim of unjust enrichment against the Bain defendants, Glazer, and Feldman, has now been voluntarily dismissed. As to those counts still at issue, Count J alleges that the Bain defendants and the Bain director defendants committed fraud by making false representations in the 2000 stock purchase agreement, and in various personal representations immediately thereafter. Count II alleges that Feldman's representation on or about April 23, 2002, certifying that KB Holdings would have a consolidated net worth of not less than $20 million, was false, and that all the defendants committed fraud by allowing Big Lots to rely to its detriment on Feldman's representation in acquiescing to the 2002 transaction, which purportedly resulted in KB Holdings being rendered insolvent. Count III alleges that Glazer and Feldman, as directors of HCC and various HCC subsidiaries, acquired fiduciary duties to Big Lots as a result of HCC's insolvency, and breached those duties by approving the 2002 transaction. Count IV makes similar allegations against the Bain director defendants. Count V alleges that the Bain defendants and the Bain director defendants aided and abetted Glazer's and Feldman's breaches of fiduciary duty as alleged in Count III. Count VII alleges that Glazer breached his fiduciary duties under Ohio law, as a director of Big Lots, in failing to inform Big Lots of HCC's pending insolvency as a result of the 2000 and 2002 transactions. Count VIII alleges that the 2002 transaction, by rendering HCC's performance of its obligations under the PIK Note impossible, constituted tortious interference with contractual relations. Finally, Count IX alleges that all the defendants

engaged in a civil conspiracy when they agreed and conspired with each other to commit the acts alleged in Counts I through VIII.

The defendants move to dismiss the amended complaint on a number of grounds.[13] First, the defendants claim that Counts II through IX are derivative and belong to the bankruptcy estate. Therefore, they argue, Big Lots has no standing to bring those claims. Second, the defendants claim that Counts I and II are barred by the statute of limitations. Third, the defendants maintain that all counts fail to state a proper claim for relief. Finally, the defendants raise a number of miscellaneous challenges to the complaint, arguing that Count I should independently be dismissed because it is contradicted by the stock purchase agreement on which it is based, and that Count II fails to allege causation.

The plaintiff argues that the complaint alleges sufficient facts to survive the defendants' motions to dismiss.

## III.

In order to dismiss a claim under Court of Chancery Rule 12(b)(6), a court "must determine with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief."[14] A court must accept as true all well pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts. But a court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs'

13. The defendants have submitted three sets of briefs; one set for both the Bain defendants and the Bain director defendants, one set on behalf of Glazer, and one set on behalf of Feldman.

14. *Grobow v. Perot*, 539 A.2d 180, 187 n. 6 (Del.1988).

favor unless they are reasonable inferences."[15]

## A. *Derivative And Direct Claims*

The defendants' primary defense to Counts II, III, IV, V, VII, VIII, and IX is that, under Delaware law, those counts set out derivative claims, belonging to the bankruptcy estate, and that Big Lots lacks standing to advance these claims. Specifically, the defendants argue, the common element to these counts is that the fundamental injury alleged is the insolvency of HCC, and that this insolvency injured Big Lots. Thus, they argue, under the relevant Delaware precedent, these claims must all be derivative. The court agrees with the defendants as to Counts III, IV, V, VIII, and IX. However, the court finds Count VII to set out a direct claim, and dismisses Count II on other grounds.

### 1. *Count II*

Count II alleges that the defendants fraudulently induced Big Lots to refrain from interfering in the 2002 transaction by issuing the April 23, 2002 Feldman letter assuring Big Lots that KB Holdings would continue to have a consolidated net worth of above $20 million after that transaction closed. Although the court notes that, under the relevant precedent, similar claims have been found to be derivative (and would therefore be barred under the facts in this case), the court dismisses Count II on the alternative ground that it fails to state a cognizable legal claim.

■ As a threshold matter, the plaintiff is correct to note that, in the bankruptcy context, some courts have permitted individual creditors to maintain direct actions for fraudulent inducement, even when those claims, in some way, implicate injury to the corporation. In *BRS Associates v. Dansker*,[16] for example, the court was faced with a fraudulent inducement claim by a creditor against a defendant in bankruptcy. Addressing itself to the difference between derivative claims and direct claims, the court ruled that certain RICO claims with regard to fraudulently induced investments were direct claims,[17] especially where the defendants' misconduct concealed the fact that a loan was in default.[18] As the court wrote in that case, this doctrine represented a "narrow exception" to the general rule that a shareholder lacks standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock.[19] Similarly, in *In re Granite Partners*,[20] the court held that a complaint alleging that the plaintiffs were fraudulently induced to invest in a company was a direct claim, even when the plaintiffs had also made allegations, such as corporate waste, mismanagement, and breach of fiduciary duty,[21] that the court dismissed as plainly derivative.[22] The fraudulent inducement claim, in that case, was not premised on the corporation's eventual bankruptcy.

The bankruptcy cases, in other words, hold that claims somewhat akin to those brought here in Count I can be brought directly. But the bankruptcy cases also make clear that fraudulent inducement claims where the only alleged injury is inextricably linked to a corporate injury

---

**15.** *Id.* at 187.

**16.** 246 B.R. 755 (S.D.N.Y 2000).

**17.** *Id.* at 769.

**18.** *Id.* at 761–62.

**19.** *Id.* at 769.

**20.** 194 B.R. 318 (Bankr.S.D.N.Y.1996).

**21.** *Id.* at 327.

**22.** *Id.*

are derivative claims. In *In re Swallen's, Inc.*,[23] for example, the court dismissed as derivative a claim by a creditor that the failure to maintain a sufficient collateral base led to the debtor's failure to repay certain debentures.[24] And in *In re WorldCom,*[25] the court held that the shareholders' claim that they were fraudulently induced not to sell their shares was derivative because they had failed to allege any distinct injury to themselves.[26] The main dividing line between direct and derivative claims styled as "fraudulent inducement," therefore, has been whether the plaintiff has alleged some injury other than that to the corporation. As such, these cases are entirely consistent with the Delaware Supreme Court's recent reformulation of the law on direct versus derivative claims in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*[27]

■ Strictly speaking, a claim for fraudulent inducement in the context of a credit agreement usually requires that the plaintiff be fraudulently induced to extend credit. On occasion, however, plaintiffs have raised a substantially different claim under the same rubric; namely, that they were fraudulently induced to *refrain* from acting to collect their debt. Courts have been extremely reluctant to grant relief in those cases.

In the admittedly early case of *Evans v. Burson,*[28] the Supreme Court of Oklahoma refused to grant relief where a seller claimed to have eschewed filing suit against a debtor on the basis of potentially fraudulent representations by the clerk overseeing a public sale. The court observed that the reason it dismissed the claim was that the "damages sought to be recovered are too remote and contingent to admit of a judgment at law therefor."[29] The plaintiff might never have had an action; the suit might never have been brought; the court might have decided that the action did not belong to the plaintiff As the *Evans* court noted, the plaintiff's possible recovery depended on "numberless unknown contingencies, and can be nothing more than conjecture."[30]

The Oklahoma Supreme Court's decision in *Evans* has been recognized as the general rule by more recent case law as well as by treatise authority.[31] Other courts,

---

**23.** 205 B.R. 879 (Bankr.S.D.Ohio 1997).

**24.** *Id.* at 883.

**25.** 323 B.R. 844 (Bankr.S.D.N.Y.2005).

**26.** *Id.* at 855.

**27.** 845 A.2d 1031 (Del.2004). Certain of these bankruptcy court cases were apparently decided on the basis of the "special injury" test rejected in *Tooley. See, e.g., In Re Granite Partners*, 194 B.R. at 333 ("the contract claims belong to the trustee, and Primavera has not alleged a special injury."). These cases have continuing relevance, a conclusion reinforced by the Supreme Court's observation in *Tooley*, discussing *Lipton v. News International*, 514 A.2d 1075 (Del.1986), that the *Lipton* court "could have reached the same correct result by simply concluding that the manipulation directly and individually harmed the stockholders, without injuring the corporation." *Tooley*, 845 A.2d at 1038.

**28.** 65 Okla. 114, 164 P. 471, 472(1917).

**29.** *Id.*

**30.** *Id.*

**31.** *Sade v. Northern Natural Gas*, 483 F.2d 230, 233 (10th Cir.1973); *Wilkenson v, Linnecke*, 251 Cal.App.2d 291, 293, 59 Cal.Rptr. 290 (1967); *Miller v. Bank of Commerce*, 387 S.W.2d 691, 692 (Tex.Civ.App.1965); 37 Am. Jur. 2D *Fraud and Deceit* § 50 (2001) (noting that "a creditor cannot maintain an action against a third party for fraudulent representations inducing the creditor merely to refrain from taking steps to collect the debt until collection has become impossible"); 37 C.J.S. *Fraud* § 53 (1997) (noting that "recovery ... cannot be had for fraudulent representation

while not citing *Evans*, have identified the wildly contingent nature ·of the requested recovery as a bar to this kind of fraudulent inducement claim.[32]  On those occasions where *Evans* has been distinguished, furthermore, it has been distinguished on the basis of case specific facts.  In *O'Gorman v. Haber*,[33] for example, the court allowed a fraudulent inducement claim for inaction where "the plaintiff intended to attach [and thus secure payment] and had the right to attach," noting that the plaintiff in that case actively "g[a]ve up this right in reliance upon the defendant's false representation...."[34]

■ The facts alleged in the instant complaint set out precisely the kind of "fraudulent inducement" claim that courts have historically rejected.  The gravamen of Count II is that Big Lots was injured because it refrained from bringing suit to stop the 2002 transaction as a result of a purportedly fraudulent misrepresentation by Glazer, a third party to the debt between Big Lots and HCC.  Nevertheless, the complaint presents no facts to suggest that the plaintiff had any sort of legal right against the defendants, or that it gave up any legal right in reliance on the allegedly fraudulent misrepresentation.  In addition, Big Lots does not allege any basis in the PIK Note or the warrants on which it could have objected to the 2002 transaction.  Further, there is no reason to be-

lieve that Big Lots ever contemplated suit, or that it had even a colorable claim against the defendants at the time of the 2002 transaction.  With the benefit of hindsight, Big Lots now claims it could have taken "affirmative action" to block the transaction.  But the complaint does not plead any contemporaneous facts suggesting that this was so.  Thus, the court will dismiss Count II for failure to adequately allege a claim of fraudulent inducement.[35]

### 2. Counts III. IV. V. VIII. And IX

The defendants argue that Counts III, IV, V, VIII, and IX, based on allegations of fraud and violations of fiduciary duty in approving the 2002 transaction, are derivative claims and therefore must be dismissed for lack of standing.  Big Lots responds that, in the context of this case, the allegations in these counts set forth direct claims for which it has standing outside the bankruptcy estate.

■ Any analysis of these claims must start with *Tooley*, the Delaware Supreme Court's foundational opinion on the distinction between direct and derivative claims.[36]  Rejecting previous, and sometimes contradictory, reliance on the so-called "special injury" test, which looked to see whether the plaintiff had alleged a "special injury,

---

inducing a creditor merely to refrain from taking steps to collect a debt until collection has become impossible ...").

**32.** *In re Worldcom*, 323 B.R. at 855 (citing *Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347, 351 (5th Cir.1987) (holding that stockholders' claims of fraudulent inducement were too speculative because there was no contention that any stockholder "desired specifically to sell their stock at a given point, but were deterred from effectuating a sale because of the misrepresentations")).

**33.** 50 R.I. 351, 147 A. 882 (1929).

**34.** *Id.* at 883.

**35.** Big Lots's claim would have somewhat more force had Big Lots brought a colorable action for injunctive relief before the 2002 transaction, which it had then surrendered on the basis of Feldman's letter.  In that circumstance, the court would still be faced with deciding whether the claim would now, after KB Toys's insolvency, be considered direct or derivative.

**36.** 845 A.2d 1031.

in whatever form," [37] the Supreme Court refocused the relevant inquiry onto two broader prongs:

> [t]he analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy? [38]

A direct claim, in other words, is a claim on which the stockholder can prevail without showing an injury or breach of duty to the corporation,[39] and one in which no relief flows to the corporation.[40]

Since *Tooley* was decided, this court has been called upon to differentiate between direct and derivative claims.[41] The most relevant of these post-*Tooley* opinions to the facts of this case is *Production Resources Group v. NCT Group*,[42] a suit brought by a creditor against a debtor, seeking the appointment of a receiver under 8 *Del. C.* § 291, and alleging that the defendant's board and a non-director officer committed various breaches of fiduciary duty.[43] The *Production Resources* court rejected any bright line test for determining whether claims are derivative or direct when brought by the creditor of an insolvent corporation. Although the court recognized that most such claims are likely to be derivative claims, under the standard in *Tooley*, the court acknowledged there might nonetheless be some circumstances in which "directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor." [44]

The unusual allegations of the plaintiff in *Production Resources* vividly illustrate how such animus could be pleaded. As the court's opinion sets out, the plaintiff had obtained a judgment against the defendant for $2 million in 1999, and had attempted to compel payment since that time. The facts alleged in the complaint established that the defendant had been insolvent for several years and, yet, had gone to extreme lengths both to avoid paying its judgment creditor and to misuse corporate power for the purpose of improperly benefiting itself and others in control.[45] In the face of such extraordinary machinations, the court was unwilling to dismiss the creditor's claims of specific injury as derivative because it seemed possible that the creditor in question was the only one that had been injured, and was thus the only one to which recovery was due. At the same time, certain other claims were dismissed as derivative, including conclusory accusations that "mismanagement and ex-

---

**37.** *Lipton*, 514 A.2d at 1078.

**38.** *Tooley*, 845 A.2d at 1035.

**39.** *Id.* at 1038.

**40.** *Id.* at 1039.

**41.** *See, e.g., Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, *13, 2005 Del. Ch. Lexis 133, *43–50 (Del.Ch. Aug. 26, 2005) (holding that a well-pleaded disclosure claim is a direct claim under *Tooley*, while claims for gross negligence, and failure to provide competent and active management are "clearly derivative"); *In re Syncor Int'l Corp. S'holders*

*Litig.*, 857 A.2d 994 (Del.Ch.2004) (holding that injuries comprising the reduction of consideration paid to shareholders in a merger caused by disclosures of purported misconduct are derivative claims).

**42.** 863 A.2d 772 (Del.Ch.2004).

**43.** *Id.* at 772.

**44.** *Id.* at 798.

**45.** *Id.* at 778.

cessive salaries" had caused the company to become insolvent.[46]

■ Big Lots urges that the facts of this case mirror those of *Production Resources*, noting similar allegations of insider payments in defiance of a "legitimate, undisputed, debt obligation" owed to it, with knowledge that the 2002 transaction would allegedly render HCC insolvent. However, there are fundamental differences between this case and *Production Resources*, a decision which relied heavily on its unique facts. As is clearly evident in *Production Resources*, all the challenged transactions occurred in the context of an already insolvent company. In contrast, the amended complaint in this case only attempts to allege that HCC became insolvent after, and as a result of, the 2002 transaction.

Additionally, the plaintiff in this case had no right to repayment of its debt at the time of the challenged transaction. Unlike the judgment creditor plaintiff in *Production Resources*, Big Lots's entire credit agreement with HCC consisted of the unsecured PIK Note, due eight years after the 2002 transaction was set to close. The immediacy of the *Production Resources* defendant's debt was a necessary

underpinning of the court's finding that the debtor's recalcitrance might have been motivated by targeted animus towards the plaintiff.[47] The PIK Note in this case sat in the distant future, making Big Lots's argument that the defendants acted with the PIK Note in mind entirely incredible.

■ Indeed, the claims brought by Big Lots in this case, if they resemble those in *Production Resources* at all, resemble the claims that the court dismissed.[48] Shorn of excess verbiage, Big Lots's fundamental complaint in the counts at issue here is that the defendants caused HCC to become insolvent through what amounted to breaches of fiduciary duty. As the court noted in *Production Resources*, however, "claims of this type are classically derivative."[49] They do not become direct simply because they are raised by a creditor, who alleges that the breaches of fiduciary duty caused it specific harm by preventing it from recovering a debt outside of bankruptcy.

That result is directly in line with good corporate policy. As numerous commentators have observed, creditors are usually better able to protect themselves than dispersed shareholders.[50] There is no doubt

---

**46.** *Id.* at 780. The court dismissed these claims in part because they set out no claim, and in part because they were derivative claims. ("Some of PRG's fiduciary duty claims rest largely on generalized and conclusory allegations that NCT's board and officers have mismanaged the firm. Claims of this kind are classically derivative, in the sense that they involve an injury to the corporation as an entity and any harm to the stockholders and creditors is purely derivative of the direct financial harm to the corporation itself."). *Id.* at 776.

**47.** As the court noted, it was the "odd" circumstances *of Production Resources* in concert that were "suggestive of . . . bad faith on the part of the NCT board members." *Id.* at 797.

**48.** *Id.* at 798.

**49.** *Id.* at 776.

**50.** *See, e.g.,* Stephen M. Bainbridge, *Much Ado About Little? Directors' Fiduciary? Duties in the Vicinity of Insolvency,* J. BUS. & TECH. L.(forthcoming) http://ssm.com/abstract=832504 at 28 (noting, for example, that "relative to many nonshareholder constituencies, shareholders are poorly positioned to extract contractual protections. Unlike bondholders, for example, whose term-limited relationship to the firm is subject to extensive negotiations and detailed contracts, shareholders have an indefinite relationship that is rarely the product of detailed negotiations"); *But see* Larry E. Ribstein & Kelli A. Alces, *Directors' Duties in Failing Firms,* J. BUS. & TECH. L. (forthcoming) http://ssrn.com/abstract=880074 at 8 (arguing that the greater protection generally due to debt-

that Big Lots was a sophisticated creditor which could have negotiated in the 2000 sale for protections against later transactions. However, the PIK Note is not alleged to contain any of the covenants and warranties that often bind debt contracts. Given the facts as pleaded, the absence of these otherwise standard provisions suggests strongly that the PIK Note was designed from the beginning to provide Big Lots some limited upside potential in the event that Bain was able to turn the KB Toys businesses into a profitable enterprise over the medium term. To imply further protections through fiduciary duty law would put the court in the awkward position of renegotiating a deal reached by extremely sophisticated and well represented parties, to the clear detriment of the bankruptcy estate. That kind of *ex post* rationalization has rarely been the practice of the Delaware judiciary, and for good reason.

Big Lots also relies on what the court may loosely designate as merger cases to bolster its argument that its current allegations represent direct claims. Specifically, it relies on *Parnes v. Bally Entertainment Corp.*,[51] a case which held that a plaintiff that attacks the fairness of a merger alleges a direct injury rather than injury to the corporation.[52] Big Lots argues that because the 2002 transaction in

this case was also allegedly "unfair," *Parties*, as reaffirmed by the Delaware Supreme Court in *Tooley*, controls the result in this case.

Big Lots's argument is based on a gross misreading of *Parnes*. That decision did not establish that every allegation of unfairness, in any transaction whatsoever, raises a direct claim. Rather, the holding in *Parnes* is necessarily premised on the fact that the challenged transaction was a merger, in which the plaintiffs would lose standing to bring derivative claims and the misconduct at issue was intimately bound up with the merger itself. Moreover, the Supreme Court held the claims at issue in *Parnes* to be direct because the purportedly unfair price paid to the shareholders in the merger did not injure the corporation in the way that mismanagement or improper self-dealing does. The facts are quite different here, where the entire injury alleged by Big Lots flows from the fact that KB Toys eventually became insolvent.

In summary, Big Lots has pleaded facts that could support a finding of injury to the corporation alone.[53] Under the test laid out in *Tooley*, therefore, it is clear that the claims asserted in Counts III, IV, V, VIII, and IX are entirely derivative in nature and cannot be maintained by Big Lots in this proceeding.[54]

holders over shareholders is not an inherent characteristic of either instrument, because such distinctions may not apply to closely held corporations, or public corporations held substantially by institutional shareholders who can act collectively or through intermediaries).

**51.** 722 A.2d 1243 (Del.1999).

**52.** *Id.* at 1245.

**53.** Count VII, which alleges a breach of fiduciary duty against Glazer in his former capacity as a director of Big Lots, is a paradigmatically direct claim brought by an aggrieved corporation (Big Lots) against one of its own

directors. That count, as discussed below, is nonetheless dismissed for failure to state a claim.

**54.** Big Lots cites two additional lines of authority for its argument that the claims it brings in this case are direct. Both are inapposite. First, Big Lots claims that nondisclosure claims are generally direct claims, citing this court's decision in *Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, at *13, 2005 Del. Ch. Lexis, at *44. Although the plaintiff is right to note that non-disclosure claims are direct claims where a defendant has "failed to disclose material information when they had a duty to disclose it," the complaint alleges no

## B. *Count I*

■ The plaintiff alleges in Count I that the Bain defendants and the Bain director defendants committed fraud in executing the stock purchase agreement for the 2000 transaction on behalf of KB Acquisition. This allegation is based, purportedly, on the text of Section 4.06 of the stock purchase agreement that formed part of the 2000 transaction, which provides, in pertinent part, that:

> Buyer has received and delivered to Seller a letter from Fleet Retail Finance Inc. and Fleet Securities Inc. ... with respect to debt financing ... in an amount sufficient to fund the Company Dividend Amount, and to enable the Buyer or its designee to pay the Share Purchase Price, and *make any other payments to be made by Buyer or its designee under this Agreement or the transactions contemplated hereby.*[55]

According to Big Lots, the italicized language above committed the defendants to ensuring that HCC would remain solvent and able to pay the PIK Note until it became due in 2010. But, Big Lots alleges, the defendants never intended to honor the purported commitment set forth in Section 4.06, and instead meant from the beginning to execute the 2002 transaction and thus render HCC insolvent. Therefore, Big Lots claims, the defendants fraudulently induced it to enter into the 2000 transaction believing that its investment in the PIK Note was secure.[56]

The plaintiff's argument entirely misconstrues Section 4.06 of the stock purchase agreement. The plain language of this provision sets out nothing more than a guarantee that the buyer, defined solely as KB Acquisition Corp.,[57] had obtained a commitment letter from Fleet, that the commitment letter was for sufficient financing to meet the buyer's obligations to close the stock purchase agreement, and that the commitment letter remained in full force and effect as of the closing. Nothing in this section imposes any obligation on HCC, or even suggests that KB Acquisition undertook therein to ensure the continued solvency of HCC for ten years into the future. Indeed, Section 4.06's emphasis on the defined "Share Purchase Price," which excludes the PIK Note, rather than the "Purchase Price,"[58] which includes that note, makes this con-

---

well-pleaded facts that establish the defendants had any duty to disclose their intention, if any, to conduct the 2002 transaction when they signed the stock purchase agreement in 2000. In the absence of a specific duty to disclose, the plaintiff has only pleaded a set of derivative fiduciary duty claims. Second, Big Lots relies on cases based on the long established and common sense principle that the same set of facts can set out both direct and derivative claims (seeking different forms of relief) to suggest that the same is true in this case. *See, e.g., Grimes v. Donald,* 673 A.2d 1207, 1212 (Del.1996). Had Big Lots pleaded facts which establish a direct claim, such as those in *Production Resources,* both the bankruptcy estate and Big Lots could have brought claims arising out of the same facts. The complaint fails, however, to adequately plead such facts.

**55.** Scaggs Aff., Ex. A § 4.06.

**56.** The court notes that, by alleging that the defendants committed fraud by inducing Big Lots to enter into a transaction based on a false statement, Big Lots has stated an unambiguously direct claim in the form suggested by *Production Resources,* 863 A.2d at 794. The defendants do not dispute the plaintiff's standing to bring this claim.

**57.** Scaggs Aff., Ex. A.

**58.** The "Purchase Price" is defined as the "Share Purchase Price, *plus* the Company Dividend Amount, *plus* the HCC note...." *Id.* at § 2.01.

clusion even more clear.[59] In sum, the only reasonable reading of Section 4.06 is that it provides comfort to the seller that the buyer intends to close the transaction, and that the buyer's financial ability to do so will remain uncompromised. To turn that entirely standard promise into an all-encompassing guarantee that KB Acquisition and all its subsidiaries will continue to be solvent for ten years stretches the plain contractual language far beyond the breaking point. Section 4.06, therefore, is unambiguous, and cannot be the basis of an allegation of fraud in the inducement against the defendants.

## C. *Count VII*

Count VII alleges that Glazer violated his fiduciary duties to Big Lots as a Big Lots director on two separate occasions. First, the plaintiff claims that Glazer violated his fiduciary duty of loyalty by approving the 2002 transaction while also serving as a Big Lots director, and by failing to disclose to Big Lots the extent of his interest in that transaction. Second, the plaintiff claims that Glazer violated his fiduciary duty of loyalty to Big Lots because he failed at the time the KB Toys businesses were sold in 2000 to disclose to Big Lots that the defendants intended to execute the 2002 transaction and thus render HCC insolvent. Big Lots claims, in essence, that Glazer's failure to disclose caused Big Lots to approve the 2000 transaction.

■ Both parties agree that Ohio law applies to Glazer's actions as a director of Big Lots, an Ohio corporation. Fiduciary duty violations under Ohio law are governed by statute, requiring that a director perform his or her duties as a director:

> in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.[60]

Additional language in the statute provides that a breach of a duty as a director gives rise to an award of money damages only if clear and convincing evidence shows that:

> [the] director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation.[61]

These two statutory provisions appear to establish a higher pleading standard for claims of monetary damages than claims for injunctive relief. Indeed, as an authority on Ohio corporate law explains:

> [a]pparently, a director can be found, by clear and convincing evidence, to have acted in a manner she does *not* reasonably believe to be in, or not opposed to, the best interests of the corporation . . . i.e., the director may be found to have breached his or her duties under R.C. § 1701.59(B) and still not be held liable in damages for that action or inaction unless it is proved, also by clear and convincing evidence, that the director acted with deliberate intent to injure the corporation, or with a "reckless disregard for the best interests of the corporation." [62]

---

59. The share purchase price, as defined by the agreement, includes only the "(i) amount in cash equal to the Cash Consideration less the Company Dividend Amount and (ii) the warrants." *Id.*

60. Ohio Rev.Code § 1701.59(B).

61. Ohio Rev.Code §§ 1701.59(C)(1), 1701.59(D); *Frank Lerner & Assoc. v. Vassy*, 74 Ohio App.3d 537, 599 N.E.2d 734, 738 (1991).

62. Julie C. Shifman, Ohio Corporation Law § 7.5 (2005).

Essentially, therefore, Ohio law establishes that in cases seeking monetary damages, a plaintiff can only succeed if it proves what, in Delaware, would amount to a lack of good faith. From this statutory foundation, Ohio courts frequently refer to Delaware case law and expertise in determining the contours of fiduciary duty.[63]

■ Delaware courts have long held that a certain duty to disclose inheres in the duty of loyalty. As this court held in *Hoover Industries v. Chase*,[64] for example, "the intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, itself constitutes a wrong...."[65] But this duty to disclose is not a general duty to disclose everything the director knows about transactions in which the corporation is involved. Rather, the director disclosure cases decided in Delaware courts have implicated circumstances in which the director is personally engaged in transactions harmful to the corporation, but beneficial to the director.[66] *Hollinger International v. Black*[67] is the paradigmatic example of this claim. In that case, the controlling shareholder and director failed to disclose that he was "shopping" the company in violation of a signed contract that forbade him to do so.[68] The court held this failure to disclose to be a violation of the director's fiduciary duty.

But even in that extreme circumstance, the court was careful to note that the duty to disclose this information was based on the specific facts of the case, which featured circumstances "under which ... full disclosure was obviously expected."[69]

■ Under this standard, Count VII's allegations concerning the 2002 transaction fail to state a claim for relief. The simple fact is that the extent of Glazer's interest in that transaction, in his capacities as an officer, director, or investor in KB Toys, was completely immaterial to Big Lots, which had no right to approve or disapprove either the transaction or Glazer's participation in it. What was arguably material to Big Lots was the fact of the transaction and its size, and there is no allegation that Big Lots was ignorant of those facts. Nor can it be said that Glazer violated some fiduciary duty owed to Big Lots under Ohio law by approving the 2002 transaction as a director of KB Toys, as his duties in that capacity ran entirely to KB Toys.

■ Count VII's claim against Glazer with respect to the 2000 transaction is critically dependent on an allegation that Glazer either knew or should have known that the defendants would execute the 2002 transaction within some short time after the sale of the KB Toys businesses

**63.** *See, e.g., Abrahamson v. Waddell*, 63 Ohio Misc.2d 270, 624 N.E.2d 1118, 1120 (Com.Pl. 1992) (citing *Paramount Commc'ns v. Time, Inc.*, 571 A.2d 1140 (Del.1989)); *Kelly v. Wellsville Foundry*, 2000 WL 1809021, 2000 Ohio App. Lexis 6287 (Ohio. Ct.App, Dec. 6, 2000) ("Delaware courts are widely renowned and respected for their expertise in the area of business law").

**64.** 1988 WL 73758, 1988 Del. Ch. Lexis 98 (Del.Ch. July 13, 1988).

**65.** *Id.* at *2, 1988 Del. Ch. Lexis 98 at *7.

**66.** *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del.1996) (finding a duty to disclose where controlling shareholders and directors failed to tell disinterested directors of an offer to buy the company, and instead arranged to sell their own shares only).

**67.** 844 A.2d 1022 (Del.Ch.2004).

**68.** *Id.* at 1061.

**69.** *Id.* at 1062.

and, thus, that Glazer should have warned the other Big Lots directors of that fact. The court must grant the defendants' motion to dismiss this claim because Big Lots has failed to sufficiently allege that Glazer actually knew or actually had reason to know that the 2002 transaction would happen. Instead, just as Big Lots would have the court infer that the proximity of the 2002 transaction and the 2004 bankruptcy means that the two are connected, it insists that the proximity of the 2000 and 2002 transactions means that Glazer knew or should have known in 2000 that the 2002 transaction was inevitable. Much more than this effort to plead knowledge in the alternative is required where a plaintiff bases a claim on a director's duty to disclose, a duty which our courts have only invoked in cases where the defendant had clear knowledge of the information at issue.[70]

To hold otherwise here would expose participants in leveraged buyout transactions, where directors or officers of the seller often emerge as directors and officers of the surviving corporation, to subsequent litigation based on mere speculation that a defendant should have known of some transaction planned by the new company within a few years after the sale, and that the transaction would turn out badly. That overly broad conception of liability is not what Delaware courts meant in establishing that a director's fiduciary duty of loyalty includes the duty to disclose known facts to his fellow directors.[71]

## IV.

For the foregoing reasons, the defendants' motions to dismiss are GRANTED as to all counts. IT IS SO ORDERED.

**DIVISION OF FAMILY SERVICES,**
Petitioner,

v.

---

**70.** *See, e.g., Int'l Equity Capital Growth Fund v. Clegg,* 1997 WL 208955, *5–6, 1997 Del. Ch. Lexis 59, *19 (Del. Ch. Apr. 22, 1997) (invoking the duty to disclose where a director had induced the board to purchase a manufacturing plant that, at the time of the purchase, was known to manufacture defective products); *Hoover,* 1988 WL 73758, at *2, 1988 Del. Ch. Lexis, at *7 (noting that a "director does breach his duty of loyalty if he knows that the company has been defrauded and does not report what he knows to the board ... at the very least when he is involved in the fraud and keeps silent in order to escape detection"); *Summit Investors II v. Sechrist Indus.,* 2002 WL 31260989, *6, 2002 Del. Ch. Lexis 117, *21 (Del. Ch. Sept. 20, 2002) (noting, in the context of the duty to disclose, that a director's "fiduciary duties do not extend to speculation concerning future events").

**71.** As one court has held in the context of fraudulent conveyance law, such suits do not "constitute insurance against the ultimate failure of the company." *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs.,* 910 F.Supp. 913, 944 (S.D.N.Y.1995). *See also, Moody v. Security Pacific Bus. Credit,* 127 B.R. 958, 989 (W.D.Pa.1991) ("[w]hile there likely were mistakes made, and while those mistakes arguably exacerbated the difficulties Jeannette began to experience in late 1982, the fraudulent conveyance laws were not designed to insure creditors against all possible consequences of a company's post-leveraged buyout errors in judgment or poor business practices").